STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CAL-
VIN PICKLES AND IRENE PICKLES, DEFENDANTS-
APPELLANTS.

Argued December 6, 1965—Decided March 21, 1966.

544

*Mr. Robert C. Gruhin* argued the cause for appellants.

*Mr. John F. Russo,* Assistant Prosecutor of Ocean County, argued the cause for respondent (*Mr. William H. Huber,* Prosecutor of Ocean County, attorney).

The opinion of the court was delivered by

FRANCIS, J. The Grand Jury of Ocean County returned an indictment in two counts against defendants Irene Pickles and Calvin Pickles, her husband. The first count against both defendants charged that "on divers dates between September 1, 1962 and October 9, 1962" they "did willfully, maliciously and feloniously mistreat their son, Michael Pickles, a child of four years, and treat him in a cruel, violent and unlawful fashion," contrary to the provisions of *N. J. S. A.* 9 :6–3. The second count charged Irene Pickles, alone, with manslaughter in that "on or about the 4th day of October 1962 [she] did feloniously kill and slay Michael Pickles," contrary to *N. J. S.* 2A :113–5. Following trial by jury on both counts of the indictment, defendant Irene Pickles was convicted of manslaughter; both defendants Irene Pickles and Calvin Pickles were convicted on the neglect count. Irene Pickles was sentenced to three to five years in the Clinton Reformatory on the manslaughter conviction, and on the neglect conviction to an indefinite term in the same reformatory, the two terms to run concurrently. Calvin Pickles was sentenced to one to two years in the New Jersey State Prison on the neglect count conviction. While their ensuing appeal from the judgments was pending in the Appellate Division we certified it for determination in this Court.

The trial, which began on January 16, 1964, extended over a period of more than five weeks and consumed 25 court days.

The record presented to us contains almost 2,400 typewritten pages. The case would have been disposed of in half the trial time, and with a record perhaps half its present size, but for the exasperatingly prolix and repetitious examination of witnesses and arguments of defense counsel, the intemperate and undignified comments, interjections and statements of the assistant prosecutor, and the inexhaustible patience of a kindly judge. Moreover, it may be noted that on this appeal appellants' brief plainly violates our rules. It contains 105 pages, the limit being 50 pages. No leave was sought to exceed that limit. *R. R.* 1:7–7. In addition the brief contains 41 questions to be presented, covering more than six of its pages. See *R. R.* 1:7–1(c). On the other hand, the State's brief, although only 42 pages in length, does not make a single page reference to the typewritten transcript or appendix in its counter statement of facts. Further, although 17 points were argued, many of which contain allusions to testimony of witnesses, such page references appear only on three pages in the brief. This too violates *R. R.* 1:7–4(a)(4); *R. R.* 1:7–1 (d). Reference to these matters is particularly important because in our view, for reasons to be stated, the interests of justice require a reversal of the defendants' convictions and a remand for a retrial—which we fully expect to be a more decorous one, reflecting when necessary the presence of a firm judicial hand.

## I.

### The Charges and the State's Bill of Particulars

The State's charge of manslaughter against Irene Pickles was based primarily on two theories: (1) On or about October 4, 1962 she placed her four-year-old son Michael in hot water for the purpose of punishing him without intending to cause his death, but that her act in placing him in the hot water was reckless and wanton and with utter disregard of circumstances likely to produce his death; (2) after placing the child in the hot water, she knew that he had suffered se-

vere burns therefrom over about a third of his body, and knowing that such burns presented a high degree of probability of serious harm and being under a duty as a parent to provide care for the child, in reckless indifference to the consequences she failed to obtain timely medical attention for him, as the result of which he died on October 12, 1962.

The neglect count of the indictment against Irene Pickles and Calvin Pickles was based primarily on the State's position that after the child was burned seriously on or about October 4, 1962, they were criminally neglectful of their duty as parents to obtain proper and competent medical treatment for him. However, the charge was designed to encompass alleged acts of neglect by them separate and distinct from, but in addition to, the allegation of neglect based on the failure to obtain medical treatment for the child. The indictment, as noted above, charged that on divers dates between September 1, 1962 (a month and four days prior to the alleged bath) and October 9, 1962, defendant-parents treated their son Michael in a cruel, violent and unlawful fashion, contrary to *N. J. S. A.* 9:6–3. The statute makes it a misdemeanor for any parent having the care, custody or control of any child, to abuse, abandon, be cruel to or neglectful of such child.

The defense requested particulars as to the alleged acts of neglect and the dates thereof. The assistant prosecutor furnished particulars in letter form, which he agreed in open court to be bound by just as if they were submitted in the fashion of a formal bill of particulars. The specification of the acts of neglect (except for Mrs. Pickles' alleged act in causing the burns and for the failure of both defendants to procure medical attention) was:

"The defendant Calvin Pickles, on at least several occasions, knowingly left his son, Michael, at his home, only in the company of Michael's infant brothers, Thomas and Robert. The children including Michael often begged neighbors for food, and they were often refused use of the bathroom in the house; consequently they wet their pants, all to the knowledge of Calvin Pickles."

Precisely the same specification was made against Irene Pickles.

Defendants' request for the dates of alleged commission of these acts of neglect obviously called for dates within the period set forth in the indictment, *i. e.* September 1, 1962 to October 9, 1962, the date on which the parents first sought treatment by a physician for their son. For some reason the State answered:

"These acts were committed by the above named defendants at diverse dates between *January 1961* and mid October 1962, at or in the vicinity of the home of the defendants, 34 Adelphia Road, South Toms River, New Jersey." (Emphasis added)

We have emphasized the January 1961 date because of some serious difficulty which arose in connection with the State's introduction of rebuttal testimony. No explanation was furnished as to why events prior to September 1, 1962 were referred to in the bill of particulars. The State recognized clearly that proof of the crime charged would be limited to the period between September 1, 1962 and October 9, 1962. At the trial the assistant prosecutor during an argument concerning the dates recited in the bill of particulars said: "This bill of particulars in no way can enlarge that indictment."

At the opening of the trial defense counsel moved for a severance of the neglect counts from the manslaughter count and requested that the matter proceed on one or the other of the charges, but not on both at that time. He asserted that the evidence introduced on the neglect charge might be very prejudicial, particularly on the manslaughter charge against Mrs. Pickles. The argument is not very clear but the force of it seemed to be that the evidence supporting the statutory offense of neglect, if accepted by the jury, might well lead them to conclude, without adequate consideration of the more serious nature of the charge of manslaughter, that guilt of manslaughter ought to follow.

The State justifiably argued that the motion was tardy. The trial court, however, heard the parties on the merits.

The assistant prosecutor urged that the court could "adequately protect" against defendants' fears in its charge. He suggested that the court would charge specifically what the jury must find to convict of manslaughter, and what must be found to convict of neglect of the child. And he argued that although a severance was discretionary, it should not be ordered in this case. The motion was denied, the trial judge saying he recognized it as his basic obligation to define the two crimes for the jury in his charge, and that under the circumstances the situation did not call for a severance. The refusal to grant the severance is one of the grounds of appeal. It may be noted here, as of some pertinence, that during the defense attorney's opening to the jury a controversy arose about his criticism of the general nature of the neglect charge in the indictment. In the course of the discussion the court pointed out that the State had furnished a bill of particulars in letter form and "conceded that it will restrict itself to the facts set up" therein.

## II.

### PROBLEMS THAT AROSE BECAUSE OF THE JOINT TRIAL OF THE NEGLECT AND MANSLAUGHTER CHARGES AGAINST BOTH DEFENDANTS

On the evening of October 9, 1962, Irene Pickles and Calvin Pickles brought Michael, their four-year-old son, to the office of Dr. Albert Pietroangelo in Toms River. The child was comatose and critically ill and the doctor arranged for his immediate admission to the Community Hospital. A pediatrician was called whose examination disclosed third degree burns of about 35% of the boy's body. The burns were on the buttocks, the genital area, both thighs, in the area of the navel, the entire right hand and part of the wrist, and a small area on the back of the left hand. An unusual and undoubtedly significant aspect of the boy's condition was that the burns extended from the buttocks about halfway down both thighs; from there to a point about halfway down

the legs, there were no burns; the burns began again about midway down the legs and covered the remainder of the legs, as well as the ankles and feet. A series of pictures, both in color and in black and white, vividly portrayed the condition as it appeared to various witnesses shortly after the hospital admission. There was much argument at the trial about their admissibility, and their receipt in evidence is challenged before us. The challenge is without merit. They were obviously admissible and undoubtedly played a substantial role in the deliberations and findings of the jury. According to defendants, particularly Mrs. Pickles, the boy's condition resulted from urine burns over a period alleged variously from five days to two weeks. The pictures cast serious doubt, to say the least, on the credibility of that story. After seeing the child one of the hospital physicians notified the prosecutor's office, as indeed it was proper for him to do in the public interest. See, McCoid, "The Battered Child and Other Assaults Upon the Family," 50 *Minn. L. Rev.* 1 (1965).

Despite efforts of the doctors at the hospital, Michael died in the early morning of October 12. He was buried on October 16. That afternoon, in response to a request to do so, Mr. and Mrs. Pickles appeared at the prosecutor's office. During the separate interrogation of Mrs. Pickles by the investigating detectives she said at first that Michael had fallen into the habit of wetting himself and having bowel movements in bed at night as well as in his clothes during the day. This produced urine burns beginning around October 4, or perhaps earlier, which she and her husband tried to treat at home with boric acid paste and solutions, vaseline and salves, until the burns worsened into the condition revealed at the hospital. Then after further questioning she allegedly sobbed out the statement that she had become irritated because of Michael's toilet habits and put him in hot water to punish him. According to the court matron who was present, Mrs. Pickles said: "I put him in hot water. I wanted to correct him." Admissibility of this statement will be considered fully hereafter.

It is not necessary for present purposes to recite in detail the evidence adduced by the State on the manslaughter count of the indictment. It is sufficient to say the proof was adequate with respect to the alleged conduct of Mrs. Pickles in causing the child's burns, as well as to her failure to obtain medical treatment for him until the evening of October 9, to warrant submission of the issue of manslaughter to the jury. See *State v. Weiner,* 41 *N. J.* 21, 26, 43–45 (1963); *State v. Watson,* 77 *N. J. L.* 299 (*Sup. Ct.* 1909); *People v. Edwards,* 42 *Misc. 2d* 930, 249 *N. Y. S. 2d* 325 (*Cty. Ct.* 1964); *State v. Mally,* 139 *Mont.* 599, 366 *P. 2d* 868 (*Sup Ct.* 1961); 1 *Wharton's Criminal Law and Procedure,* §§ 296, 298 (*12th ed.* 1957); *Annotations,* 10 *A. L. R.* 1137 (1921); 100 *A. L. R. 2d* 483, 498–502 (1965); *cf. State v. Beach,* 329 *S. W. 2d* 712 (*Mo. Sup. Ct.,* 1959); *Craig v. State,* 220 *Md.* 590, 155 *A. 2d* 684 (*Ct. App.* 1959).

In this connection note may be taken of *Stehr v. State,* 92 *Neb.* 755, 139 *N. W.* 676, 45 *L. R. A., N. S.,* 559 (*Sup. Ct.* 1913), affirmed 94 *Neb.* 151, 142 *N. W.* 670, 45 *L. R. A., N. S.,* 563 (*Sup. Ct.* 1913). There the defendant was convicted of manslaughter in connection with the death of his stepson who was about four years old. The child, who lived with his mother and stepfather, was afflicted with bedwetting and because of it the stepfather was in the habit of punishing the child frequently and quite severely. On December 31, 1910 a blizzard occurred and that night the weather was very cold. Stehr allowed the fire to go out, although he had a small supply of coal. Sometime during the night he discovered that the boy had wet his bed; that the bedding was frozen stiff; that the room was full of frost; that snow had drifted through a crack in the door and through a broken window pane. Notwithstanding this situation defendant did not build a fire; he turned the mattress over on which the boy was sleeping and placed him back in the bed alone, where he lay until the next morning. About five days later it was discovered that the child's feet had been frozen and had begun to show signs of discoloration. Mrs. Stehr said the child's feet

looked gray and somewhat green in spots. Defendant then applied hot water and dressed the feet with cloths saturated with vaseline. No physician was called until January 16, at which time the child's feet were so badly decomposed that the stench from them had become unbearable. Two doctors were then consulted who declined the case because defendant had no money. One recommended the city physician who came in, made an examination and informed defendant amputation was absolutely necessary because of the gangrenous condition of the feet. The operation was performed but the sepsis had developed to such an extent that recovery was impossible and on January 22, the child died.

Defendant who was charged with manslaughter defended on the ground that he was an ignorant German, unable to speak English, and was without means to procure medical assistance. The conviction was affirmed, the court saying that in view of what Stehr admitted he saw about the child's condition, it was "idle to assert that he was so ignorant as not to realize the necessity for calling a physician." The court noted also that although neither defendant's earnings as a day laborer nor those of his wife who took in laundry work, were very substantial, this fact would not excuse him. In such case if he was unable to supply medical attention, his duty was to take advantage of the poor laws by reporting the case to the public authorities for their relief. Under the circumstances the court held it was for the jury to say whether the degree of failure of defendant to perform his duty toward the child was criminally culpable.

It was with respect to the proof of the neglect count against both Mr. and Mrs. Pickles that the difficulty arose, which in our judgment makes retrial of the case necessary. If the charges had been confined to the circumstances originating with the alleged bath in hot water on or about October 4, 1962 and the failure to obtain medical treatment thereafter until the child appeared to be *in extremis,* the issues to be determined could have been sharply defined and contained. As to Mrs. Pickles the criminal charges would have been (1)

whether in placing her son in the hot water to punish him, as the result of which he died, she was guilty of criminal conduct constituting manslaughter; (2) whether in view of her knowledge of the child's condition after the bath, which she gave to punish him, and her duty to provide medical attention, her failure to obtain such attention for him warranted a jury finding of manslaughter, or (3) whether, even though there was no criminal conduct by her in the giving of a bath, she knew the child's condition was such thereafter that medical attention was required and her failure to obtain it constituted conduct of such a reckless or wanton character as to indicate an utter indifference on her part to the life of her son.

The neglect count against both parents, although inartistically drawn, having in mind the nature of the State's case, is clear cut enough if confined to the two situations which are at the core of the prosecution, *i. e.* (1) as to Irene Pickles: The placing of the child in hot water thus inflicting serious bodily burns on him, and the failure to solicit competent medical treatment for approximately one week thereafter; and (2) as to Calvin Pickles: Neglecting "third degree burns on the body of his son Michael, to the point of early gangrene before seeking medical treatment by a competent physician and permitting him to be treated at home, without first consulting a doctor." This part of the indictment is based upon *N. J. S. A.* 9 :6–1 which defines cruelty, among other things as "(d) any willful act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child." Neglect is defined as "(a) willfully failing to provide proper and sufficient food, clothing, maintenance [and] * * * medical attention or surgical treatment, * * * or (b) failure to do or permit to be done any act necessary for the child's physical or moral well-being."

It should be noted here that the neglect charge against Mrs. Pickles (as shown by the State's bill of particulars) is the same factually as the manslaughter charge, except for the

allegations relating to her conduct toward Michael between September 1 and October 4, 1962. Undoubtedly the thesis of the State in this connection was that the jury could find that the circumstances in their totality were not sufficiently criminal in nature to constitute manslaughter, but were sufficient to establish criminal neglect within the meaning of the statute. *N. J. S. A.* 9:6–3.

But in the neglect charge against Mr. Pickles no allegation is made that he knew Mrs. Pickles had put the boy in hot water. The charge is simply that he failed to seek prompt and proper medical treatment for his son's "third degree burns." Thus, trial of the alleged statutory violation against Mr. Pickles could be had without reference to any criminality in connection with the manner in which the child sustained the burns. Moreover, a separate proceeding devoted solely to the issue of Mr. Pickles' guilt would avoid the serious problem of prejudice arising against him as a result of his wife's alleged admission that she put their son in hot water to punish him.

As we have said, if the time periods involved in the charges of manslaughter and neglect were both fixed as beginning October 4, the date of the alleged punitive bath (assuming it was proper to try the charges or the defendants in a single trial), then the issues would be clear and compact. But when the time period for the neglect charge is extended back to September 1, 1962, so as to include alleged additional acts of neglect unrelated to the child's burns and the failure to obtain competent treatment, the possibility of prejudice to both defendants, but particularly Mr. Pickles, from a joint trial becomes evident.

Let us look at the evidence offered as to acts of neglect of Michael between September 1 and October 4, the date of the hot water immersion as claimed by the State.

The defendant Irene Pickles was 24 years of age when the events occurred for which she was indicted. She had been married to Calvin Pickles for seven years, had three children, and was pregnant at the time with her fourth child. In Octo-

ber 1962, Thomas was six years old, Michael, the decedent, was four, and Robert was three.

The State called Mrs. Theresa Principato as a witness on the subject of neglect. She lived next door to the Pickleses and was obviously hostile to them. She had a seven-year-old son who did not play with the Pickles children very often. Her son, Anthony, and Thomas, the oldest Pickles child, fought at times she guessed "over toys." She and her husband were friendly with the Yannettes who lived immediately to the rear of the defendants. At the request of the Yannettes, her husband put up a fence along the rear line of the Yannettes' and the Pickleses' lots. The Yannettes wished to leave a gate in the fence to enable them to walk over the Pickleses' property to visit the Principatos. The Pickleses consented and then apparently the fence was put on the Pickleses' lot ten feet beyond the Yannettes' line. This was "a mistake" according to Mrs. Principato. The plain inference is that the encroachment caused difficulty.

Mrs. Principato testified that during a period between six weeks and two months prior to the time Michael was taken to the hospital (the time being fixed by the assistant prosecutor), she saw the Pickles children playing around their house. At times she heard the children "just call 'Mommy' " and Mrs. Pickles would never come to the window or open the door for them. She did not say where she was when she heard the call, nor did she say anything to indicate Mrs. Pickles heard or could have heard the call. From the call "Mommy" she assumed they wanted to go to the bathroom because thereafter she noticed the younger children wet themselves, following which they would remain outside for two or three hours in their wet condition. She conceded, however, the doors of the Pickles home were unlocked; she saw the children go in and out, but she endeavored to give the impression that although Thomas, the six-year-old, was able to open the doors, the two younger boys might not be able to reach the door knob. She saw Thomas go in the house without ringing the bell. In this connection another State's witness, Mrs. Barbara Schwartz,

testified that on her visits to the Pickles home she saw the three children come in and out of the house, opening the doors themselves.

Mrs. Yannette, the neighbor to the rear, was called by the State. Having had her attention directed to the period between September and October 1962, she said she noticed the Pickles children about 100 feet away playing around their house. She gave a paraphrase of Mrs. Principato's testimony, saying: "Well, the two smaller children I used to see them go to the door, and that they had to go to the bathroom but I never saw any response; and then they would wet their pants and sit there and play for two or three hours." She could not say how many times she saw this in September and October 1962, but it was not "too often." It was obvious from her testimony also that some problem had arisen with the Pickleses over the gate the Yannettes wanted to put in their rear line fence.

Presumably the proof just outlined was designed to support the allegation in the bill of particulars that the defendants' children "were often refused use of the bathroom in the house; consequently they wet their pants, all to the knowledge of Calvin Pickles" and "Irene Pickles." It falls far short of proof of such knowledge on the defendants' part, and provides no evidence of criminal neglect. But it was capable certainly of introducing an aura of prejudice into the case, particularly as to Calvin Pickles, there not being the slightest indication he knew of the alleged situation.

Mrs. Principato said also that when the Pickles children were outside they were always asking for cookies. She often gave cookies to them. She asked Mrs. Pickles if she wanted the children to have cookies between meals and Mrs. Pickles gave permission. The witness testified also that when the children were out playing she saw them go "into the garbage and lick the crumbs off the papers or empty boxes of cookies and take out the crumbs." She made no statement as to the number of times she saw this, or that she ever told Mr. or Mrs. Pickles about it, or that they ever saw it.

Presumably this testimony was adduced to support the statement in the bill of particulars that "the children, including Michael, often begged neighbors for food." It lacked probative force for that purpose. But undoubtedly it served as a stimulus to the development of a courtroom climate unfavorable to the defendants, and again particularly to Mr. Pickles.

Mrs. Principato testified further that the Pickles children were left alone "many a night in the summer" while the parents were out visiting, and she would hear them screaming. It appeared, however, that on the occasions when the children were left alone, the parents were down the street on the same block visiting the State's witness, Mrs. Schwartz. And according to Mrs. Schwartz on some of these occasions either her daughter or mother would go down to the Pickles home.

Mrs. Principato asserted also that on some occasions in the cold weather the Pickleses would leave the three children in their car or truck while they talked with customers, actual or prospective, of Mr. Pickles' cabinet-making business in which he was then engaged. This testimony is practically incomprehensible. There is no clear statement as to where or when or how frequently this occurred. If it occurred during "the cold weather" undoubtedly it did not happen between September 1 and October 9, the period covered by the indictment. The witness did say that Pickles was in business for himself as a cabinetmaker at the time. The proof demonstrates conclusively that Pickles had not been self-employed since October 23, 1961 when (as shown by company records) he went to work for Minnesota Mining & Manufacturing Co. in Freehold, N. J. Thus the alleged incident or incidents were beyond any period included in the indictment and also beyond any time period made relevant at the trial. Moreover, this act did not appear in the bill of particulars, which the assistant prosecutor acknowledged a number of times was a limitation on the State's proof.

The above analysis of the State's evidence, relating to the period between September 1 and October 4, 1962, offered

allegedly in support of the charge of statutory neglect, must be considered insubstantial. Also the proof had no real relation to the primary criminality alleged, *i. e.,* the giving of the punitive bath, and the failure to provide competent medical treatment for the burned child. But, that type of proof undoubtedly tended to create a prejudicial trial atmosphere toward the defendants, particularly Mr. Pickles, which would have been avoided by severance of the neglect charge against him.

The probable unfavorable courtroom climate thus generated was deepened by evidence adduced by the State in alleged rebuttal of some defense testimony. It came about this way. When defendant Irene Pickles was on the stand, her attorney inquired as to how she ran her home. Upon the State's objection that such testimony should be limited to the neglect count period, *i. e.,* September 1 to October 9, 1962, and after some discussion about the matter between court and counsel, the court ruled he would allow the defense to introduce such proof covering one year prior to the death of the child, or back to October 1961. Thereafter, the assistant prosecutor by objections and favorable court rulings made certain that the defense evidence did not antedate the last three months of 1961.

In rebuttal the State produced Mrs. Rosemary Brennan who had been living in the same community as defendants for about five years before the trial. She was asked by the assistant prosecutor if she had been in the Pickleses' home "let's say from October 1961 to 1962," and on answering in the affirmative she was asked to describe its condition. At this defendants' attorney objected asserting the testimony was improper rebuttal. The State then pointed out that the court had allowed the defense to go back to October 1961, and so the assistant prosecutor had "chosen to present Mrs. Brennan *who has testimony or information during that period within a year.*" Upon that representation, the defense objection was overruled. There followed, under the guise of rebuttal the most damaging evidence in the entire case so far as it was

based upon alleged neglectful conduct of defendants prior to the alleged punitive bath of October 4, 1962.

Mrs. Brennan testified that on one occasion after Christmas 1961 she came to the defendants' home at about 3:30 in the afternoon in connection with some cabinet work that Calvin Pickles was doing for her. When she came into the house she said it was "a pig sty, unfit to live in." She said:

"Well everything was just helter-skelter. There was dishes in the sink. She offered my girl friend and myself a cup of coffee and had to wash a cup. There was not a clean cup in the house. Dishes all over the kitchen table. Not one meals dishes, but just laid there, and in the midst of all this they were sitting rolling cigarettes. In the midst of all this pure unadulterated filth * * *."

She asserted that at this time of the afternoon the children were still in their pajamas. She said also that there were enough pots and dishes around to be there for a week; "I have never seen a house like it and I have never seen one since." She was asked on cross-examination what else there was in the kitchen that she observed. She said: "It was just everything — you name it, it was there." She testified that Mrs. Pickles had to "clear off a chair to sit on." When asked what was on the chair she said "I couldn't say, clothes, books, the works."

Mrs. Brennan came back a second time in January 1962 and "the house was still dirty. It was not quite as bad as the first time. Then she knew we were coming. The first time I came over she did not know we were coming. * * * However, there were clothes all over the couch in the living room." She was shown some tables in the living room in connection with the work she was interested in, but they had to be cleared off so she could see them. She said "they took the dirt off the end tables, whatever was on them." It was "just accumulation" that had never been picked up. It was "junk." "If you had seen it, you would know it was dirt."

She said further that in January 1962 around this same time she saw the Pickles children in the carport of their house

"and they were eating from the garbage can." She saw Bobby take something "from the garbage can"; * * * "whatever it was he took he * * * was eating and went back for more." There was some confusion about the date of the garbage can incident. At one point she fixed it as in January 1962, and at another point some months later. She swore also that sometime toward the end of January 1962, Mr. and Mrs. Pickles came to her house in the husband's pick-up truck. This too was in connection with the work he was doing for her. The children were in the truck and remained in the front cab. It was very cold outside. The Pickleses arrived at her house at 11:30 A. M. and did not leave until 4:00 or 4:30 P. M., and all of this time they left the children out in the truck, although a number of times Mrs. Brennan wanted to bring them in and let them play in her cellar. Finally they brought the "baby" in around 1:00 or 2:00 P. M. The other two children remained outside. She wanted to give them something to eat, but the defendants declined. She did give the baby cookies and milk. When she asked Mrs. Pickles if the baby could have a drink of milk the mother said that none of her children "could keep whole milk on their stomachs, they vomited it up. * * *" Mrs. Brennan went on to say that the baby kept asking for the milk and she gave it to him. She said he drank "quite a bit of the whole milk" with some cookies and "he did not vomit."

During the direct and cross-examination there were a good many objections by defense counsel on the ground that the proof was not proper rebuttal, but they were all overruled for the reason stated above. Mrs. Brennan knew these incidents took place at the times she stated in 1962, because of the cabinet work that Mr. Pickles was doing for her, more particularly, making or staining a "room divider." It later appeared when Calvin Pickles was recalled that beyond all doubt the work for Mrs. Brennan was completed prior to January 21, 1961. His books were produced which showed it, as well as a bill to J. Brennan, dated January 21, 1961, covering the work. Furthermore, as we have already noted, Pickles

began working for the Minnesota Company on October 23, 1961. There is not the slightest doubt from the testimony and the records that January 1961 is the correct time, and that Mrs. Brennan, whose charges fairly breathe prejudice against the Pickleses, was off the track by a year. To give certainty to her statements as to the time when the alleged incidents occurred that she had described, she said: "He had this business going down in the cellar. He was doing work for everybody down in the cellar." And she added: "He was supposed to be making a desk for this Mrs. Holster, but she never got that. *. * *"

The aspect of this rebuttal which is most disturbing is the indication that the State knew that the incidents described by Mrs. Brennan took place in December 1960 or January 1961, or was willing to speculate that they occurred between October 1961 and October 1962. If the State did not know or did not have specific information that the events occurred in December 1961 or January 1962, the witness should not have been put on the stand on the representation that she had information relating to the period between October 1961 and October 1962.

As we have noted earlier, in the bill of particulars the State alleged acts of neglect "between January 1961 and mid October 1962." This allegation was made despite the fact that the State conceded it was limited in its proof of criminal neglect to the indictment period September 1 to October 9, 1962. But we are not concerned with any legal problem arising from that specification at this juncture. Its significance now is this: Mrs. Brennan's testimony, which so indisputably related to January 1961, was the only evidence offered at this long trial which could possibly have involved that date. A fair inference, therefore, is that the assistant prosecutor at least was mistaken when he suggested to the court that Mrs. Brennan had information relating to events between October 1961 and October 1962. If so, in view of the nature of her testimony should he not have been most careful to make certain the time element was correct?

After Calvin Pickles had resumed the witness stand and produced his records relating to the Brennan work, defense counsel moved for a mistrial alleging that Mrs. Brennan's testimony was improper and obviously would prejudice the jury against the defendants. He intimated also that the State knew the Brennan incidents were in January 1961. The jury was out of the room when the motion was made and the assistant prosecutor replied:

"I did not want to talk before the jury that in my opinion Mr. Gruhin, throughout this trial, has consistently, intentionally, misquoted testimony, argued with the Court, and disregarded the Court's rulings. So that I think Mr. Gruhin is in no position to attack motives of the Assistant Prosecutor or anyone else. And in addition, as usual, his argument is unsound and unfounded both in fact and in law. He states that in answer to the bill of particulars the Prosecutor said divers dates between January 1961 and October 1962, and where did we get that date, it must have been from Mrs. Brennan. *Of course it was.* If the Court please, we know of Mrs. Brennan in October or November of 1962. In fact, as I recall, Detective Kennedy advised me she was in the hospital the same time as the Pickles baby. She gave us the information. She gave upon the stand what happened during that period of time. * * *" (Emphasis ours)

More acrimonious comments followed. Then defense counsel made very clear that he was questioning the propriety of the State in introducing Mrs. Brennan's testimony when it knew that the incidents were in 1961. The assistant prosecutor replied he would read into the record the information he had at the beginning of the trial from Mrs. Brennan, or at least as of the day she took the stand. There was some further discussion about this following which he read a memorandum about Mrs. Brennan which he indicated came from the detective Kennedy. It was:

"As to Rosemary Brennan, recalls one time came to visit her and the children were out in car four and a half hours. Many times they asked to come in. Paid no attention to this."

The assistant prosecutor said that the Kennedy memorandum was the extent of his information "before she took the

stand and testified. We knew nothing about any dates, if any exact dates were given. I think she testified that she was not sure of any dates *until* she took the stand." (Emphasis ours) If we accept this statement of the assistant prosecutor, that he did not know of any dates from Mrs. Brennan before he put her on the stand (even though it is contrary to what he had said earlier), how could he have offered her testimony as rebuttal? And if he put her on the stand without knowing any dates it would seem that the prejudice to the defendants is even greater. At least if the assistant prosecutor had asked leave of the court to produce in rebuttal testimony of neglect of Michael back as far as December 1960 and January 1961, the problem could have been argued before the court out of the presence of the jury. But no such suggestion or request was made.

Undoubtedly testimony of the nature of Mrs. Brennan's, coming at the end of the case, had substantial capacity to influence the jury, and probably hastened the defendants' conviction.

■ The pictures introduced by the State showing Michael's condition on admission to the hospital, and Mrs. Pickles' alleged admission that she put him in hot water to punish him, made a strong case against her. The jury, however, could have believed her denial that she made the admission, as well as her denial that she intentionally gave the boy a bath which burned him. And the jury could have found, in spite of the persuasiveness of the State's case to the contrary, that she was not aware of the serious nature of the child's burns, and believed they were improving under the medication being administered by her and her husband, until the condition took a relatively sudden turn for the worse, whereupon she sought medical aid. Some factual support for her statement in this regard is to be found in the testimony of the State's witness, Mrs. Schwartz. Ordinarily, it is not the function of an appellate tribunal to appraise the likelihood of a jury's accepting a defense version of an alleged criminal incident or incidents. Problems arising from the credibility of witnesses under our

system are regarded as in the jury domain. But appellate courts are deeply concerned with the fairness of trials of persons charged with crime whose lives or liberty are at stake. And the intensity of that concern cannot be regulated according to our view of the strength or weakness of the State's case. As this Court said by Justice Jacobs in *State v. Orecchio*, 16 *N. J.* 125, 141–142 (1954), "* * * despite understandable impatience and occasional miscarriage, courts of justice must act upon the belief that the truly guilty [persons] will be so found by juries after fair trials conducted in accordance with time tested legal principles; * * *."

As far as the trial court is concerned, when the State represented Mrs. Brennan's evidence would relate to conduct of the defendants within the one-year period prior to Michael's death, it was within his discretion to permit its introduction as rebuttal. But when the defense later demonstrated beyond doubt that she was referring to incidents which, if they occurred at all, took place a year earlier than she asserted, the motion for mistrial might well have been granted. Error is not predicated on that refusal, however, and, therefore, we do not pass upon the question. Defendants assert on this appeal that the State knew that Mrs. Brennan's evidence related to January 1961 and not January 1962 and suppressed the true date in its zeal for a conviction. It is not necessary to make and we make no such finding on the record. It may be regarded and we so regard it as an inadvertence which happened in the heat of a difficult trial. But irrespective of the circumstances which brought Mrs. Brennan to the witness stand, the conclusion of probable substantial detriment to the defendants' case, and again especially to Calvin Pickles, is inescapable. As we have said, the insubstantial character of the testimony of Mrs. Principato and Mrs. Yannette as to alleged happenings prior to the principal event with which this criminal case is concerned, undoubtedly stimulated an unfavorable climate for both Pickleses. And human nature being what it is, that climate must have been intensified by Mrs. Brennan to the point where defendants' right to a fair trial was endan-

gered seriously. Such a conclusion calls for remedial appellate intervention.

 It must be recognized that a much clearer picture of the respective interests and defenses of Irene Pickles and her husband, Calvin Pickles, is available now than when the trial court was asked for a severance. Perhaps if defense counsel had made his motion for severance in a more timely manner and presented it with greater detail as to the respective factual situation of each defendant as he knew it from the indictment, the bill of particulars, his own clients, and to the extent that the State had given him pretrial information, the court might have had a better idea of the possibility of prejudice to Calvin Pickles if the neglect charge against him went to trial with the manslaughter and neglect charges against his wife. In this connection another factor is worthy of consideration. It is arguable from the record that Pickles, who worked regularly week-days in Freehold, during the period in question, did not have as intimate knowledge of Michael's condition or its cause, or as constant contact with the attempts at treatment or the response to the treatment, as did his wife. Yet he might well feel restraint before a jury in attempting to establish that his more limited involvement in the entire matter, even if it did bespeak some negligence on his part, did not rise to the level of criminal neglect. The notion that a jury might react unfavorably if they felt Pickles was attempting to exonerate himself at the expense of his wife, cannot be ignored. Thus on all the facts, it is questionable whether in a joint trial the husband can obtain from a jury the independent consideration of the neglect charge against him that the just administration of the criminal law demands. Consequently, since in our view a retrial must be ordered, if a motion for a severance as to Calvin Pickles is made after the remand, it should be granted.

 Under all the circumstances the judgments of conviction are reversed as to both defendants and the cause is remanded for disposition consistent herewith. A severance shall be granted as to the neglect count against Calvin Pickles, if

requested, and he shall be tried separately from Irene Pickles. The retrial of Mrs. Pickles may cover both the manslaughter and neglect charges of the indictment. In connection with the statutory neglect count on the present record we see no evidence of inculpatory value against either defendant arising from the testimony of Mrs. Principato and Mrs. Yannette as to the post-October 4, 1962 events. Also as matters ultimately developed, Mrs. Brennan's testimony was not properly within the boundaries of the issues against defendants either as framed by the indictment or as enlarged at the trial to include the period back to October 1961. Accordingly, retrial as to both manslaughter and neglect charges shall be limited to issues arising out of the alleged bath incident, and the failure to provide necessary medical treatment for the child's burns. Evidence of defendants' conduct between September 1, 1962 and the date of the burns, intended to show independent acts of neglect, shall not be deemed within the issues specified.

## III.

### ADMISSIBILITY OF THE ALLEGED INCULPATORY STATEMENT OF DEFENDANT IRENE PICKLES

In presenting Irene Pickles' inculpatory statement at the trial the State treated it as an admission presumably because it was not in writing and not cast in the usual shape of a formal confession. Consequently no effort was made to engage in the preliminary hearing usually pursued when a confession is involved for the purpose of obtaining a ruling from the court as to its voluntariness. In our judgment its inculpatory character was of such significant proportions, particularly in view of the manslaughter charge, that it should have been handled procedurally in the manner prescribed for proof of confessions. See, *State v. Wolf,* 44 *N. J.* 176, 193–194 (1965); *State v. Sullivan,* 43 *N. J.* 209, 224, 226 (1964); *State v. Jackson,* 43 *N. J.* 148, 166–167 (1964), *certiorari* denied *Ravenell v. New Jersey,* 379 *U. S.* 982, 85

*S. Ct.* 690, 13 *L. Ed.* 2d 572 (1965); *State v. Tassiello,* 39 *N. J.* 282, 292 n. 2 (1963).

It is true the defendants did not demand a preliminary hearing on the issue of voluntariness. The failure in that respect is mitigated considerably because their attorney was not aware before trial that an admission of such serious implications would be offered. Nor did they know of its nature until the first detective actually uttered the alleged words before the jury. Perhaps the proper, or at least advisable, course to be pursued at that moment was to request that the jury be excused and the preliminary hearing then instituted. But the matter had already been spread before the jury, and on the spur of the moment, defense counsel may have felt the better tactic was to let all the proof on the subject go in and endeavor to deal with the matter thereafter. In such situation an appellate court ordinarily should not penalize the defendants for failing to insist upon strict adherence to the procedural mechanics for introduction of a confession. *Cf. Goldstein v. Pennsylvania Greyhound Lines,* 23 *N. J. Super.* 126 *(App. Div.* 1952). The record shows, however, that when the State had completed the testimony of its witnesses to Mrs. Pickles' admission, defendants moved to strike it on the ground that the proof showed it did not meet the requirement of voluntariness. Again, at the close of the case when a motion for judgment of acquittal was made, defendants urged the admission should not be considered because it violated due process of law. Under the circumstances we put aside possible procedural impediments to a full review of the facts relating to the admissibility of Mrs. Pickles' alleged statement.

At the time of the events which gave rise to this prosecution Mrs. Pickles was pregnant with her fourth child. The testimony shows that after Michael died and during the wake and funeral period she was not sleeping well, her stomach was upset, she had not been able to eat very much, "and she felt dizzy." The funeral took place in Newark, New Jersey, where Mrs. Pickles' mother lived. After the interment defendants went back to Mrs. Pickles' mother's home where Calvin

Pickles received a telephone call from Ocean County Detective Couch asking him and his wife to come to the prosecutor's office in Toms River that afternoon. Pickles was reluctant to bring his wife because of her condition and inquired if it was necessary to come that day. He testified that Couch told him to come down; there was nothing to worry about, just some forms had to be filled out. Defendants complied and drove to Toms River arriving there around 2:30 P. M. on October 16.

On their arrival at the prosecutor's office Detectives Kennedy and Couch took Calvin Pickles into a room variously called a squad room or interrogation room, for questioning. The room was not a large one; it was described by Detective Couch as a square room, about eight feet by 17 or 18 feet. Mrs. Pickles was told to sit outside in a hall or corridor. The questioning took 35 minutes to 40 minutes. Then Mrs. Pickles was asked to come in.

During the examination of some of the witnesses and in argument at the trial, defense counsel suggested that Calvin Pickles was denied permission to be with his wife while she was being questioned by the detectives. The assistant prosecutor opposed this on the ground that the testimony was being misquoted. In this connection the examination of Detective Kennedy shows:

"Q. The door was closed, was it not, to the room?
A. Yes, sir.
Q. And Mr. Pickles was outside and she was inside?
A. Yes, sir.
Q. Had Mr. Pickles been in the room before?
A. Yes, sir.
Q. Do you recall Mr. Pickles saying anything about he wants to be in with his wife?
A. Yes, sir.
Q. Was that after you opened the door?
A. This was before the interview started with Mrs. Pickles.
Q. And why didn't you permit him in the room with his wife?
A. Because we wanted to interrogate them separately."

It may be noted at this point also, that later in the trial when Mrs. Pickles was being cross-examined, she said: "They had

no right to leave me alone there, to treat me that way. I wanted my husband and they wouldn't bring him in."

A further circumstance about to be discussed gives rise to a strong inference that the detectives had doubt as to whether Mrs. Pickles was capable physically and emotionally at the time to undergo police interrogation. Before the questioning began Detective Kennedy went into a county courtroom and asked Mrs. Thelma Barney, a uniformed court officer or court matron, to leave her duties there and come into the interrogation room. Mrs. Barney had been a court officer for some time. She was connected with the Sheriff's department and assigned to the courts, not to the prosecutor's office. Her usual duties were to swear in witnesses at trials, take care of jurors, and give aid to persons who became "emotionally upset." All she knew specifically about the Pickles matter was that she was called into the prosecutor's office "to be with a person that was brought in there for questioning." On leaving her post she brought some ammoniated pellets with her.

On entering the room she saw Detective Kennedy sitting in a chair on one side of a table. Mrs. Pickles was seated in a chair on the other side of the table, about six or seven feet away. Detective Couch was seated in a corner of the room. Mrs. Barney testifying for the State said that Mrs. Pickles was sobbing, shaking a lot, trembling, very nervous and upset. Her hand was trembling. So Mrs. Barney sat down alongside her and took the trembling hand. In addition, as it "might calm her," Mrs. Barney took an ammoniated pellet, broke it and handed it to Mrs. Pickles to move back and forth under her nose. As she gave the pellet to Mrs. Pickles she said: "Take this and maybe this will calm you a little." But even after using the pellet Mrs. Pickles "was still shaking and still very much upset." That was the situation when Detective Kennedy commenced the interrogation. No testimony was introduced by the State to show that either detective advised Mrs. Pickles before interrogating her that she was not obliged to answer their questions, or that if she did answer, anything she said might be used against her.

According to Mrs. Barney, Kennedy questioned Mrs. Pickles first, and then Couch questioned her. The witness did not recollect very much about the questions; she was "paying attention to [Mrs. Pickles]. She was so nervous," and Mrs. Barney "was there to give her help, aid." Mrs. Barney did remember that "several times" the questions related to urine burns. During the questioning Mrs. Pickles was "sobbing a lot and trying to answer questions." The witness "believed" she was comprehending the questions being asked; she seemed "all right that way"; she was answering questions.

At another point in the questioning Mrs. Barney asked Mrs. Pickles if she would like some aromatic spirits of ammonia. In some manner, she did not know how, someone got word to a Mrs. Tilton, another court officer, and she appeared with a glass containing the ammonia. It is not clear when this occurred. At one time Mrs. Barney said Mrs. Tilton arrived "after a little bit of questioning" by the detectives. At another time she said that during the interrogation, although again it is not clear as to how long after the questioning began, Mrs. Pickles said: "I put him in hot water. I wanted to correct him." On cross-examination Mrs. Barney said this admission "was, maybe, I would say, ten minutes before she made this statement, that she had the ammonia." Then:

"Q. You mean she had the ammonia before?
A. Yes.
Q. And the capsule before?
A. Well, I gave her the capsule as soon as I came into the room."

On direct examination she had said the statement was made before the drink of spirits of ammonia was given; that after making the admission Mrs. Pickles seemed calm for a few minutes, then became very nervous again, as the result of which the drink was obtained for her. Then she asked for her husband and Calvin Pickles was allowed to come into the room.

Detective Kennedy said Detective Couch had called the funeral home in Newark and requested the Pickleses to come to the prosecutor's office that afternoon. They arrived about 2:30 P. M. and Calvin Pickles was questioned first by Detective Couch and then by himself for about 30 minutes in the interrogation room. Then Mr. Pickles was sent out of the room and Mrs. Pickles brought in. As has been noted above, Kennedy refused to allow the husband to remain during the interrogation of his wife.

Kennedy said Couch questioned Mrs. Pickles first, then he questioned her, and then Couch began to question her again. They went over the story with her about the urine burns on her son, about bathing him and the treatment she gave for the burns before seeking medical aid. She told him she had bathed Michael in warm water, then under questioning she said it might have been hot. When Couch took up the questioning again "to clarify her story," she "broke down completely" and told them she had put the child in hot water to punish him. At this time she was sobbing and emotionally upset. He asked if she wanted a doctor or a priest, but he insisted that was after she made the admission. Couch testified: "I suppose you could say she was hysterical"; it was "quite possible" that she was "distraught."

Contrary to Mrs. Barney's testimony, Couch said Mrs. Pickles was composed until she made the inculpatory statement. Then she broke down, became hysterical and called for her husband. Kennedy did not see any first aid administered by Mrs. Barney to Mrs. Pickles. He remembered going out of the room once during the questioning, and he knew a second court matron, Mrs. Tilton, came into the room, but he did not see her administer any first aid to Mrs. Pickles.

Couch testified that he asked Mrs. Pickles if she wanted a priest but denied he added "so you can confess." On being asked if any treatment or first aid was given in the room, he said "None. I don't recall that she required any. She was asked." He knew the matron Mrs. Barney was in the room all the time, and that at one time, but after Mrs. Pickles had

admitted giving Michael a hot bath, another court matron, Mrs. Tilton, came in and "gave assistance to the matron that was present." But he did not know what either or both of them did for Mrs. Pickles. He "did not watch"; he "had no idea what they did."

In view of the testimony of Mrs. Barney and the confined area where the questioning took place, a room eight feet by 17 or 18 feet, occupied as it was at all times by four persons, and during the time of and to the extent of Mrs. Tilton's appearance therein, by five persons, it is simply incredible that the detectives did not see and did not know either that first aid was given to Mrs. Pickles, or of what it consisted.

After the testimony of the detectives and the court matron, Mrs. Barney, had been completed, defendants moved to strike the admission from the record on the ground that the circumstances under which it was taken were so fundamentally unfair as to render it involuntary and inadmissible. In passing on the question the court said among other things that Mrs. Pickles was questioned for "something less than an hour"; further: "Now, there is no question but that she was distraught. However, the fact that she was distraught does not impair her ability to commit herself. It may affect her credibility, but it does not affect the admissibility, because it was not shown that her will was overcome." The motion was denied.

During the defense both defendants testified about the interrogation by Detectives Couch and Kennedy. Mrs. Pickles said when she was taken into the room for questioning, she was upset, trembling, confused and crying. She had not been able to sleep or eat much. Both detectives were there and the court matron came in and sat with her. They went "over and over" her account of Michael's condition. They suggested she put him in hot water to punish him. They asked whether she would feel better if she had a priest; she could make her confession to him. She said her mind kept wandering under the questioning. She had asked for her husband; she asked again and kept asking; she said she wanted to go home. Finally

she screamed for him and ultimately they allowed him to come in. The questioning then ceased and they were asked to come back the next day. She denied making the admission she had put her son in hot water to punish him.

. Calvin Pickles said he was told to sit outside while the detectives questioned his wife. After a while he heard his wife scream and he knocked on the door of the room. The door was locked. Detective Kennedy opened it, saw him and closed it again. He could hear his wife crying. He heard her say: "I didn't do it. I didn't do anything like that." About ten minutes later Kennedy opened the door and informed Mr. Pickles his wife wanted to see him. He said also that Mrs. Pickles admitted she had put Michael in hot water to punish him. Pickles asked her immediately if she had said anything like that and she denied it. Then in response to his request the detectives said he could take his wife home. But they were asked to come back the next day. It took about ten minutes to calm his wife down before she could leave. She was shaking, nervous, and not able to stand up. He took her home where his mother undressed her and put her to bed until they thought she was able to travel. Then they brought her to his mother's home in Keansburg, N. J. The next day they came back to the prosecutor's office as directed, but there was no further interrogation and they declined to give any written statements. They returned to Calvin Pickles' mother's home. On arrival Mrs. Pickles was upset and shaking and could not keep anything on her stomach. Pickles' mother called Dr. Rudnick of Keyport that night. He gave her a sedative and prescribed some pills.

At the close of all the testimony the motion to strike the confession evidence was not renewed specifically. A Motion was made for a judgment of acquittal and during the course of the argument thereon, it was urged that such evidence was improper and violative of due process. The motion was denied and the issue of voluntariness of the statement was submitted to the jury for determination.

 Although, as we have already indicated, the record with respect to the alleged incriminatory statement is not as symmetrical as procedural regularity ordinarily calls for, in our judgment the issue of its competency must be determined. We are satisfied on the State's own proof that the alleged statement should not have been admitted. In our judgment that proof did not show it to be voluntary. On the contrary in our view the circumstances under which it was obtained were so fundamentally unfair as to transgress Irene Pickles' due process rights under the Fourteenth Amendment of the United States Constitution.

 The voluntariness of inculpatory admissions is not tested only by the presence or absence of violence or threats to the accused or by whether there were direct or implied promises to him of reward or benefit. Admissibility depends also on the nature of the interrogation, and whether psychological coercion or duress or imposition was practiced by law enforcement authorities. In sum the competency of a confession not only depends upon compliance with the ordinary rules of evidence, but also upon the deeper requirement of fundamental fairness in the due process sense of the Fourteenth Amendment. *State v. Driver,* 38 *N. J.* 255, 281 (1962); *State v. Fauntleroy,* 36 *N. J.* 379 (1962); *State v. Smith,* 32 *N. J.* 501 (1960), *certiorari* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961).

 As the United States Supreme Court said in *Blackburn v. State of Alabama,* 361 *U. S.* 199, 206–207, 80 *S. Ct.* 274, 4 *L. Ed.* 2d 242, 248 (1960), the due process clause of the Federal Constitution forbids fundamental unfairness in obtaining confessions, whether they are true or false. Consequently, a confession so obtained cannot be introduced, irrespective of whether other evidence corroborates it or proves the guilt of the accused. "Thus, in cases of involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against

his will. This insistence upon putting the government to the task of proving guilt by means other than inquisition was engendered by historical abuses which are quite familiar."

Production of evidence necessary to satisfy the burden imposed by this broad concept of voluntariness of confessions rests with the State and evaluation of that evidence in the first instance is the clear duty of the trial court. He is not at liberty to shift that responsibility to the shoulders of the jury. Moreover, appellate review of the issue must be searching and critical as well. *State v. Driver, supra,* 38 *N. J.,* at *p.* 282. If upon such analysis at either level the State has not shown that the statement constituting the confession was the product of "an essentially free and unconstrained choice," it must be rejected. See *Culombe v. Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 1879, 6 *L. Ed. 2d* 1037, 1057 (1961).

Here, it is obvious that Irene Pickles' seriously inculpatory admission, if made, was extracted by basically unfair means. There can be no doubt that when she came to the prosecutor's office after her son's funeral, her condition, on the State's proof alone, was such that she was an easy prey to interrogative pressure. The need for the medication administered to her by the court matron, to which the detectives seemed to close their eyes, plainly revealed her physical and mental weakness, and should have been sufficient warning to stay their hand. The condition which was manifest to the matron was the product of her nature when exposed to stress. The trial court recognized her emotional weakness when subjected to the stress of the trial. On the motion for a new trial, which he denied, he said, although not in connection with admissibility of her confession:

"During the trial she had repeated seizures of hysterics which caused at least five recesses, some lasting a day; ambulances were called and doctors were called * * *."

To submit such a woman to interrogation of the type described in the proof, and in the face of her condition as

described by the court matron, was to trespass upon rudimentary principles of fairness. The trespass was aggravated by Detective Kennedy's deliberate exclusion of her husband from the interrogation room. That act served not only to further weaken her resistance, but to deprive her of an important and vital witness as well.

Review of the circumstances attending the taking of the incriminating statement from Irene Pickles satisfies us they were so oppressively coercive and fundamentally unfair in their totality as to require the conclusion that the statement was not voluntary in the constitutional sense. See, *State v. Naglee,* 44 *N. J.* 209, 218–219 (1965). Therefore, the admission should have been stricken from the record on defendants' motion.

## IV.

Some of the other questions raised on this appeal may be referred to in summary fashion:

(a) Admission of the testimony of the expert chemist and toxicologist as to his idea of how the child could have received burns of their unusual locations by immersion in a tub of hot water, although seemingly in large measure no more than the kind of guesswork a layman might indulge in, nevertheless was within the Court's discretion.

(b) It was not erroneous to refuse to order production of the hospital records to prove the number of hepatitis cases being treated at the hospital during Michael's stay there and until he died. The medical evidence established the primary cause of Michael's death as toxic hepatitis produced by infection resulting from his third degree burns. The fact that there were other cases of hepatitis, of whatever type, at the hospital was irrelevant according to our study of the record. Defendants produced no medical evidence at the trial, nor did they develop any other factual basis suggesting possible relevancy of such records.

(c) The form of indictment is sufficient to charge manslaughter. *R. R.* 3:4–3(c); *State v. Brown,* 22 *N. J.* 405,

414 (1956). Furthermore, the fact that the date of the child's death is referred to as "on or about the 4th day of October 1962" instead of the actual date, October 12, 1962, does not invalidate the charge. The date of death is not the essence of the crime charged and certainly the defendants suffered no prejudice from the inexact statement of the date. *State v. Hubbs*, 70 *N. J. Super.* 322, 331 (*App. Div.* 1961); *State v. Calabrese*, 99 *N. J. L.* 312 (*Sup. Ct.* 1924), affirmed o. b. 100 *N. J. L.* 412 (*E. & A.* 1924).

(d) In the assistant prosecutor's opening to the jury he said:

> "[I]n every criminal case, there is only one person that can furnish answers to some questions, and that is the defendant in every criminal case. I wasn't there and neither were you. If we were there probably would be no case, you see. It was the defendant only that was there and the defendant only can give us certain answers."

This statement was improper and we assume will not be repeated at retrial. The present state of the law, which in fairness to the State must be said not to have been as clear at the time of this trial as it has since become, forbids the prosecution or the court from placing the defendant in a position where he must testify in order to avoid an adverse inference on the part of the jury. See *Griffin v. State of California*, 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965); *Malloy v. Hogan*, 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed. 2d* 653 (1964); *Redfield v. United States*, 315 *F. 2d* 76, 80 (9 *Cir.* 1963); *McKnight v. United States*, 115 *F.* 972, 983 (6 *Cir.* 1902); *State v. Ripa*, 45 *N. J.* 199 (1965). Such comment has the tendency to cut down on the scope of the accused's Fifth Amendment protection.

(e) There was no error on the part of the trial judge in refusing to allow the oldest child, Thomas, to testify. The preliminary questioning conducted out of the presence of the jury amply justified the court in concluding the degree of competency necessary to qualify as a witness was not present. See *State v. Gambutti*, 36 *N. J. Super.* 219, 223 (*App. Div.*

1955). Nor was the court in error in refusing to permit the children to be marked as exhibits, or to allow them to be paraded in front of the jury box for inspection. It was obvious from comments made during the trial that defense counsel had the children prominently displayed for whatever advantage he believed would flow from their presence. A courtroom is not a stage and the dramatics of offering the children in evidence or demanding that they be permitted to parade in front of the jury should be dispensed with at retrial.

(f) We find no error in the trial court's instruction to the jury regarding the causal relation between the child's burns and his death, and the alleged possible effect of some other or additional medical treatment on the chance of survival. See, *Perkins, Criminal Law* (1957) 629.

(g) Admissibility of the death certificate under the proof adduced was within the discretion of the trial judge. Defendants sustained no prejudice therefrom.

(h) It is unnecessary to consider any other alleged grounds of appeal. We suggest, however, for purposes of the retrial:

1. There should be a pretrial conference at which much of the first trial controversy over exhibits can be eliminated.

2. There was considerable contention at the trial about leading questions. Much of it was unnecessary; the objection was largely ritualistic and over-emphasized. Both sides were guilty of some leading, but much of it could well have been ignored in the interest of less discord. See *State v. Abbott,* 36 *N. J.* 63, 78–79 (1961); *Rider v. Lynch,* 42 *N. J.* 465, 470–471 (1964); *People v. Hodge,* 141 *Mich.* 312, 104 *N. W.* 599 (*Sup. Ct.* 1905); 3 *Wigmore, Evidence,* § 770, *p.* 124 (*3d ed.* 1940). Control of the matter rests in the discretion of the trial court, and a reasonable exercise of it at the new trial must be assumed.

## V.

In accordance with the above discussion, the judgments of conviction are reversed and the cause is remanded for retrial.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and HALL—5.

*For affirmance*—None.