**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1350-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SERGIO DEROSA,

    Defendant-Appellant.

_____

Argued October 1, 2020 – Decided October 29, 2020

Before Judges Sumners, Geiger, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 16-09-2118.

Michele A. Adubato, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michele A. Adubato, on the brief).

Adam D. Klein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).

PER CURIAM

Defendant Sergio DeRosa claimed that he accidently fatally shot his wife, Lynn DeRosa, while he was cleaning his shotgun in the living room of their home. A jury found him guilty of first degree knowing or purposeful murder, N.J.S.A. 2C:11-3(a)(1).

On appeal, defendant argues that his conviction should be vacated and the case be remanded for a new trial because: (1) the court erred in denying his motion to strike the testimony of a State's witness and to dismiss the indictment based on discovery violations; (2) the court erred in failing to rule on the voluntariness of his statement and in denying his motion to suppress; (3) the prosecutor's withholding discovery and comments during summation on facts not in evidence deprived him of a fair trial; (4) the court erred in denying his motion for a new trial; and (5) the court's cumulative errors denied him a fair trial. We disagree and affirm.

I.

To provide context to the issues raised by defendant, we summarize the testimony adduced during the trial.

A. The State's Case

At approximately 9:30 p.m. on May 26, 2014, defendant called 9-1-1 from his home in Mullica Township screaming for help because he said, "the gun went off, oh my god," and "I just hurt my wife." The 9-1-1 operator heard

an alarm going off in the background and then defendant hung up. Defendant also left a message on his son Christopher's phone screaming, "[h]elp me, Chris, help me." Christopher, who was employed as a State Trooper, immediately called his father back, but defendant did not answer the call.

At the same time, Eric Schnitzel, defendant's next-door neighbor and a volunteer firefighter, walked over when he heard defendant screaming for help. Schnitzel testified that as he approached defendant's house, he saw defendant lying on his front porch screaming and heard the house alarm going off. Defendant asked Schnitzel to help his wife Lynn, who was inside the house, claiming he shot her "by accident" when she asked him to "clean the gun," and that he did not "realize there was a live round in there." Defendant did not offer to go inside the house with Schnitzel. Schnitzel found Lynn, who was wearing pajamas, lying on the couch in the living room. He testified that Lynn "was lifeless," had no pulse, and appeared to be dead.

Meanwhile, Officer Ryan Spencer of the Mullica Township Police Department was dispatched to defendant's home on a report of "shots fired." Upon arrival, he observed that defendant, who was wearing a tee shirt, boxers, and high socks, was seated on the front porch, and was screaming and yelling. With his gun drawn, Spencer ordered defendant onto the ground. Defendant complied and then began rolling around in the driveway screaming, "I shot my

wife, I thought it was a dummy round, she's dead, I want to die." Spencer handcuffed defendant, retrieved his cell phone, gave him a blanket to cover himself, and placed him in the back of the patrol car. Spencer testified that there was blood on defendant's hands but not on his cell phone.

Officer Michael Jamerson arrived at the scene shortly after Spencer. Upon arrival, Jamerson observed that defendant appeared "extremely . . . animated," and "kept yelling my wife, my wife, I shot her." Jamerson entered the house and found Lynn lying on the couch facing defendant's recliner chair, with "blood all around her head area." He also observed a shotgun with a bag of cleaning supplies, a gun bag, and a spent shell casing next to the shotgun on the clean light-colored carpet. Inside the gun bag were two loose A-Zoom snap caps (not live rounds), one loose round of Federal Premium 12-gauge buckshot, and a partially filled box of target rounds, which defendant and Lynn used to go clay sport shooting. Jamerson checked Lynn's vitals and confirmed that she was dead.

Jamerson and Spencer then transported defendant to the Atlantic County Prosecutor's Office (Prosecutor's Office). Jamerson testified that defendant seemed "agitated," did not seem "normal," and kept asking to be taken to the hospital to see Lynn but calmed down en route.

4

At approximately 10:40 p.m., Detective Paul Micheletti of the Prosecutor's Office arrived at the scene. Micheletti, the State's expert in crime scenes, testified that the house was "very well kept" and "very clean." He observed that Lynn had sustained what appeared to be a gunshot wound to her right temple and that there was blood on her head, clothing, and the sofa. He also observed white shotgun particulate, or gunshot powder, on the surface of her right eyelid.

Micheletti found two guns in the living room—an uncased 12-gauge semiautomatic Benelli Vinci shotgun with the chamber in the open position on the floor and another shotgun in a case on the floor which was not loaded with either a snap cap or a live round. He also found a gun bag on the floor on the left side of the recliner, an expended shot gun shell on the floor in close proximity to the chair, and gun cleaning supplies, including brushes, rods, gun oil, a bore snake, and rags, on a towel or cloth on the floor in front of the chair. He testified that cleaning a gun usually causes an area to get dirty, but that the light-colored carpet around the cleaning supplies was "very clean." He also found an empty packaging container for two A-Zoom 12-gauge snap caps in a dresser in the master bedroom, which fit the snap caps found in the gun bag.

An autopsy performed by Dr. Marianne Hamel, a forensic pathologist, revealed that the cause of Lynn's death "was a shotgun wound to the head with

skull fractures and brain injuries," and that the manner of death was "[h]omicide."  Hamel found "fine white particulate matter over the right side of her face and her hair," and around her eyelids, but no injury to her eyes. Hamel concluded that "[t]he lack of injury to the surface of her eye suggests that her eyes were closed at the time of the incident."

Meanwhile, beginning at 11:35 p.m. on the night of the shooting, defendant gave a lengthy video-recorded statement at the Prosecutor's Office to Detectives Bill Anton and Chris Silva, which was played for the jury. Anton read defendant his Miranda[1] rights, and defendant signed the waiver, stating "[w]hatever you want I will tell you everything."  During the approximately three-hour interview, defendant's behavior swung from being extremely agitated and animated, to being relatively calm and lucid.  He repeatedly admitted that he had fired the gun, and repeatedly asked to see his wife, but vehemently denied that he had intended to kill her, claiming that Lynn was his "rock," they were inseparable, they were "madly in love with each other," and they rarely ever argued.

Defendant, who collected social security disability payments and considered himself a professional poker player, explained that he had spent the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1350-17T1

6

day at the race track with his brothers and had intended to stay overnight at the Borgata casino and play in a poker tournament but decided to go with his brother to the racetrack instead. He arrived home about 5:30 p.m., made dinner for Lynn, who arrived home around 7:00 p.m., and then they watched television in the living room together. At some point, Lynn asked him to clean the guns because, as was their custom, they had gone target shooting on the previous day but had not, as they normally did, cleaned the guns when they returned home. Defendant claimed that Lynn had recently bought "very expensive" guns, that it had been her idea to start target shooting, and that he did not know much about guns, but that she was teaching him.

Defendant said that Lynn, who was lying on the couch in the living room, coached him how to clean the gun while he was seated in the recliner holding the gun on his lap. He cleaned the gun with a "bore snake," and then reached into the gun bag on the floor on his left side, and put what he thought was a snap cap into the gun, released the safety, pulled the trigger to release the tension, and then "boom, it went off." He saw blood coming out of Lynn's ear, and when he touched her to try and "wake her up," he got blood on his hand. Defendant started screaming, activated the alarm system, and called 9-1-1.

Defendant repeatedly denied intentionally choosing a live round, but admitted that he knew there was a box of light load shells for target shooting in the bag, as well as two heavy duty shells that Ron Karrer, a friend of Lynn's, had given her as a gift. Defendant said that Karrer, the manager of a feed and grain store, who delivered hay and grain to their house for their horses, had started Lynn's interest in shooting and had taught her how to shoot. Defendant, who at one point referred to Ron as "a f***king redneck, scum," vehemently denied that Lynn had had an affair with Ron, and said that even if she had, he would not have killed her, but would have just moved on and gotten a divorce, even though his brother "lost half a million . . . dollars" getting divorced.

In any event, defendant said that he had purchased the two snap caps three days earlier during a trip with Lynn to Cabela's because she had been using one of Karrer's snap caps and had to give it back to him. A receipt from Cabela's dated May 23, 2014, which was admitted into evidence, indicated that on that date Lynn had purchased a box of 12-gauge target load shells and a snake bore, used to clean the barrel of the shotgun, but no buckshot shells or snap caps.

During his statement, defendant also volunteered that Lynn, who earned approximately $80,000 a year as an x-ray technician, "loved to buy nice

A-1350-17T1

things," had "nice taste," owned horses, and bought a new sports car every six months, including a Porsche, BMW, and Mercedes. He said that they had placed all of their assets in Lynn's name because he had previously owned a restaurant and wanted to protect them, and that Lynn "control[led]" their money, and "handled all the finances." He claimed he did not know if his wife had a life insurance policy and said that he gave her $700 per month from his disability benefits to pay off an outstanding loan from their restaurant business.

At the conclusion of his statement, defendant was not placed under arrest and was taken to the hospital for a psychiatric examination because he had talked about wanting to harm himself. He was subsequently transferred to a psychiatric hospital where he remained for approximately three weeks.

On June 5, 2014, defendant's son Christopher filed a petition to be appointed as the administrator of his mother's estate, and in July 2014, obtained a restraining order against defendant for harassing and threatening him. A six-month probate battle between Christopher and defendant ensued. The matter was ultimately resolved in November 2014, when defendant signed an agreement giving up all his rights to the estate. Christopher claimed that defendant had an unspecified ulterior motive for signing the agreement and did not do so because he wanted to repair their relationship.

Christopher testified that during the probate battle, defendant told him that in June or July 2014, he had taken the money out of the safety deposit box that, at defendant's urging, Christopher had set up for his mother years earlier. Defendant did not tell Christopher when he removed the money and told him "not to tell anybody." Defendant had previously told him that there was $80,000 in cash from the sale of Lynn's mother's house in the box. Christopher recalled that at some point after 2010, he suggested that they use the money to pay the outstanding loan for the restaurant kitchen equipment. He testified that defendant became "angry," and began screaming and yelling, "[j]ust don't go into the box, you're not going into that box, I'll pay for it, I'll take care of it." He believed that defendant made the $700 per month restaurant loan payment because he did not want Lynn to go into the box and find out that the money was missing. Shortly after Lynn's death, Christopher opened the safety deposit box and it was empty.

In November 2014, after Christopher became the administrator of his mother's estate, he went to her residence and retrieved defendant's key to the safety deposit box that was taped to the back of a painting with a "receipt" for $84,700. He thoroughly searched the house but found no cash. He also claimed that defendant was aware of the details of Lynn's finances because

when he searched the house, he found that defendant had taken out all of Lynn's financial papers, including her life insurance policy.

Christopher received $103,000 in life insurance proceeds, and as part of his mother's estate, the contents of her checking account. Defendant subsequently filed a complaint against Christopher and Gloria, Christopher's wife, alleging that they stole $60,000 and personal items from the house.

Christopher presented a very different picture of the state of his parent's marriage. He testified that his parents were "distant," and fought, bickered, and argued "[m]ostly [about] money, money issues." He testified that his parents had even argued on the way to Cabela's on May 23, 2014. Christopher also testified that all his parent's assets were in his mother's name because his mother did not trust defendant "with finances." Gloria similarly testified that defendant and Lynn argued about money all the time, and said that after Lynn's death, defendant had demanded $20,000 from them, but they did not give it to him because he had killed Lynn for her money.

Christopher and Gloria also confirmed that Karrer had introduced Lynn to target shooting, that Karrer often texted and called Lynn, and that approximately two months before Lynn was killed, defendant asked Christopher to tell Lynn to stop talking to Karrer. Karrer, who said he was "friendly" with Lynn, testified that he gave her a buckshot cartridge as a gift,

that they had had weekly contact, and texted each other "every day or every other day back and forth."

In March 2015, Elaine Murphy, a poker dealer at the Borgata, came forward and reported to Lieutenant Kevin Ruga of the Prosecutor's Office, that prior to Lynn's death, defendant, who had played poker at her table one-to-three times a week for eight-to-ten years, said, "I'm going to kill my wife." She responded to him, "Come on, Serg," and defendant, who did not appear to be joking, said, "literally I'm going to kill my wife." She asked defendant "what did she do," and he said that his wife was "lazy, she don't do nothing, she just sits around, [and] she spends money."

Murphy did not tell anyone at the time about defendant's statement because she did not "take it serious[ly]." However, she changed her mind about the seriousness of the statement in the summer of 2014, when while in the break room with Mark Carlin and a couple of other co-workers, one of her co-workers showed her a picture of defendant on his or her phone and said that defendant had shot his wife. Murphy told her co-workers what defendant had said but did not come forward at that time because she was "hoping it would get solved without [her] help" and she "did not want to get involved."

Murphy explained that she finally came forward in March 2015, ten months after Lynn's death, because "[i]t was just eating" her that defendant,

who had not yet been arrested, was still coming to the Borgata to play and that "maybe the information [she] had might be pertinent and [she] should probably talk to somebody." She was "a hundred percent sure" that defendant had said he wanted to kill his wife "and that's why [she] came forward." Murphy was, however, only seventy-five percent sure of the exact wording of his response that he wanted to do so because his wife was lazy and spent money.

When Murphy first spoke to Ruga in March 2015, she did not remember the exact date defendant made that statement, but recalled it occurred approximately two to four months before June 2014, when she found out about Lynn's death, and on the only day defendant had played "2-5 No Limit poker"; he normally played "1-2 No Limit poker." Murphy said that she could probably pinpoint the day if she reviewed the Borgata's records, which she did not have access to.

During trial preparation, Murphy reviewed the records of defendant's gambling at the Borgata for the period from January to September 2014. Murphy testified that the records showed defendant only played "2-5 No Limit" poker on one day in 2014—April 26, 2014—which confirmed that was when defendant made the statement.

Defendant was arrested and subsequently indicted for second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). A superseding indictment charged defendant with first-degree knowing or purposeful murder.

Defendant was tried before a different judge and a jury in July 2017. At trial, Emanuel Kapelsohn, the State's expert in firearms and shooting scene reconstructions, testified that cleaning a shotgun is a "messy job," the kind of "job for the garage or basement usually." He explained that cleaning a gun involves the use of solvents and oils, and that the bristle brush used to clean the barrel flings bits of black soot or carbon "in all directions." Kapelsohn opined that you can immediately tell the difference between the Federal Cartridge 12-gauge double buckshot used to kill Lynn, and the A-Zoom snapshot that defendant said he thought he had loaded into the gun. The buckshot shell was a plastic tube with a crimped top and a steel brass-plated head or base. In contrast, although the snap cap was similar in dimension and weight, it was a solid metal tube that had no crimping, and significantly, did not have a brass head. Kapelsohn stated that "the brass [head] is obvious, it's easy to see, it's obvious, it has a live primer in it."

Kapelsohn explained that although a person might not know simply by feel which shell he was grabbing,

> if the person were simply to take a moment to look at what he was grabbing before inserting it into the shotgun, it should be immediately apparent to anyone who has fired a shotgun as many times as [defendant] had, whether the object he has in his hand is or is not a live shotgun shell.

He further testified there was no reason to use a snap cap in the Benelli Vinci semiautomatic single-barrel shotgun because a snap cap is used to prevent damage caused by dry-firing for storage, and the Benelli does not sustain damage during dry-firing.

Nonetheless, Kapelsohn concluded that based on the entry wound and trajectory of the pellets, it was possible that defendant shot Lynn while he was seated on the chair with the shotgun rested across his lap and Lynn was laying on the couch. However, he said that the gun could have been fired from any number of positions, including holding the gun near his hip level and from a kneeling position, "that would put the shotgun at about the level or a little below the level of her head." On cross-examination, he testified that he could not reach a conclusion, based on the physical evidence, "whether it was intentional or unintentional. I made it clear that I wasn't deciding that it was clearly unintentional."

B. The Defense

Carlin, who was employed as a poker dealer at the Borgata, testified that although he may have been in the break room with Murphy during the summer of 2014, and might have heard people talking about defendant having shot his wife, he denied that Murphy told anyone in his presence that defendant had said he was going to kill his wife, or that he showed Murphy a picture of defendant on his phone. He confirmed, however, that he had only seen defendant play "1-2 No Limit poker," and that the Borgata records revealed that defendant had played "2-5 No Limit" poker on only one day, April 26, 2014. He testified that defendant, who was a regular customer for several years, had a reputation for being honest, courteous and a gentleman, seemed "very well-balanced," and did not get really upset when he lost a hand of poker.

Defendant testified on his own behalf. He provided background information about his career in the restaurant industry, claimed he loved his wife unconditionally, was very attentive to her, and that money was never an issue in the family. He denied having ever spoken to Murphy about Lynn and denied that he would ever have called Lynn "lazy," because she was "totally [the] opposite" of lazy.

Defendant testified substantially in accord with his statement to the police as to the events leading up to Lynn's death. He vehemently denied

intentionally shooting her. Defendant testified that at approximately 9:00 p.m. that evening, Lynn reminded him that they had forgotten to clean the guns. While seated on the recliner, he began to clean one of the guns with the new bore snake. Lynn, who was lying on the couch watching him, started laughing and told him that he was doing it wrong, and instructed him how to pull the bore through the barrel and then told him to "get the snap cap out."

Defendant reached into the gun bag with his right hand, which was on his left side on the floor, and pulled out a snap cap. He did not look in the bag before he picked up the shell because his "mind didn't tell [him] to look at it." Defendant claimed he did not expect that a live round was in the bag because "[t]he only thing that Lynn told [him] were the snap caps were inside the bag." He then placed the shell in the gun on his lap, pulled the trigger, and "boom." He ran over to Lynn, whose eyes were open, touched her face and noticed a little blood by her ear, but did not see the bullet wound and "[n]ever, never" thought she was dead.

After Lynn's death, defendant sent a letter to Christopher dated May 29, 2014, stating that he would give everything to him if he would agree to care for Lynn's horses. He claimed that, "I did something stupid to make sure that the animals would be taken care of until they die, any money I had, whatever money I had in the house."

Defendant was treated at a psychiatric facility for about three weeks after the shooting. After he was released from the facility on June 18, 2014, he returned home and claimed he found that Christopher had stolen jewelry, $47,200 in cash, and other valuables. He also claimed that he and Lynn had taken about $85,000 in cash out of the safety deposit box on February 4, 2011, three years before her death, to cover expenses and to put a down payment on the Mercedes.

On cross-examination, defendant admitted that he "was freely and willing to tell them the truth" during the interrogation, that "[t]he police were very, very nice" to him, that he "felt safe," and that his statement was "accurate." However, some of his testimony was inconsistent with his prior statement, notably, that he did not know the buckshot shells were in the bag on the day of the shooting, did not know that Karrer had given Lynn the buckshot shells until the trial, did not routinely clean the guns after they went shooting on Sundays, and did not often stay overnight at the Borgata. He blamed Karrer for Lynn's death, claiming that she would be alive if he had not given her the buckshot shells. He denied, however, that he did not like Karrer, and said he called everyone a "redneck."

The motion judge denied defendant's motion to suppress the videotaped statement, finding defendant had been properly administered Miranda rights

and made a knowing, voluntary, and intelligent waiver of those rights. The trial judge also denied defendant's motions to strike Murphy's testimony, to dismiss the indictment based on alleged discovery violations, for a directed verdict, and for a new trial.

The jury found defendant guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1). On October 3, 2017, he was sentenced to the mandatory minimum thirty-year prison term with a thirty-year parole disqualifier, N.J.S.A. 2C:11-3(b)(1). This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT'S FAILURE TO DISMISS THE INDICTMENT OR STRIKE THE TESTIMONY OF MS. MURPHY DUE TO THE STATE'S EGREGIOUS FAILURE TO MAKE TIMELY DISCLOSURE OF DISCOVERY DENIED DEFENDANT A FAIR TRIAL.

POINT II

THE MOTION COURT'S REFUSAL TO RULE ON THE VOLUNTARINESS OF DEFENDANT'S STATEMENT AT THE PRE-TRIAL HEARING MANDATED THAT DEFENDANT'S STATEMENT SHOULD BE SUPPRESSED AND EXCLUDED FROM EVIDENCE.

POINT III

A-1350-17T1

IT WAS ERROR FOR THE COURT TO DENY DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR DISCOVERY VIOLATIONS.

POINT IV

THE FAILURE OF DEFENDANT TO KNOWINGLY, VOLUNTARILY AND INTELLIGENTLY WAIVE HIS RIGHTS TO REMAIN SILENT MANDATED THAT HIS STATEMENT BE SUPPRESSED.

POINT V

CONDUCT BY THE PROSECUTOR IN WITHHOLDING DISCOVERY AND COMMENTS MADE BY HIM DURING HIS SUMMATION ON FACTS NOT IN EVIDENCE DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT VI

DENIAL OF THE DEFENDANT'S MOTION FOR NEW TRIAL WAS ERROR.

POINT VII

THE AGGREGATE OF ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not raised below).

II.

We first address defendant's argument that the trial court erred in denying his motion to strike Murphy's testimony and to dismiss the indictment due to the State's alleged failure to timely disclose all of Murphy's statements and exculpatory information it received from Carlin. At issue are four pieces

of evidence: (1) Murphy's unrecorded statement in 2016, pinpointing April 26, 2014, as the date defendant told her he wanted to kill his wife; (2) Murphy's unrecorded statement two weeks before trial regarding defendant's comment that his wife was lazy and spent money; (3) Carlin's unrecorded statement to the detectives on July 3, 2017; and (4) Carlin's recorded statement to Ruga in July 2017, denying that he showed Murphy a picture of defendant on his phone, which was provided to the defense.

Ruga prepared a report detailing Murphy's March 2015 statement, which, together with a transcript of her recorded statement, was submitted to the defense in discovery, but was not admitted into evidence at trial. In that statement, Murphy reported to Ruga that prior to Lynn's death, defendant said, "I'm going to kill my wife." She did not remember the exact date defendant made that statement, but recalled it occurred approximately two-to-four months before she found out about Lynn's death, and on the only day defendant had played "2-5 No Limit poker." Murphy said she could probably pinpoint the day if she reviewed the Borgata's records of defendant's gambling. She also said that she told three co-workers, including Carlin, about defendant's statement sometime during the summer of 2014.

Sometime later, possibly in 2016, the Prosecutor's Office obtained the Borgata records and showed them to Murphy. Based on those records,

Murphy determined that defendant made the statement on April 26, 2014, a date within the time frame that she initially said the comment occurred. Ruga did not document Murphy's statement in a report, although the Borgata records were provided to the defense in discovery.

Additionally, according to Ruga, approximately two weeks before the trial began, Murphy told him that although she was not one hundred percent sure, she believed that when she asked defendant what his wife had done, he responded that his wife was lazy and spent money. Ruga did not document the statement or otherwise divulge the contents.

The defense learned, for the first time during Murphy's testimony at trial on July 12, 2017, that she claimed that defendant had made the statement on April 26, 2014, and that when she asked him what his wife had done, he responded that "she's lazy, she don't do nothing, she just sits around, [and] she spends money."

On July 13, 2017, at the conclusion of the State's case, the defense moved to exclude the entirety of Murphy's testimony for discovery violations, or at least those portions that were not provided in discovery. The judge denied the motion, finding that the defense had been placed on notice that defendant made the statement two or four months before the incident, and that Murphy had been subjected "to cross-examination as to why she didn't say this

then."  The judge noted that "the jury paid attention to it, and to the extent that her story may have varied or she may have supplemented it, it wasn't the subject of such surprise that counsel wasn't able to address it capably in cross-examination."  On that same date, the court found, in denying defendant's motion for a directed verdict, that even in the absence of Murphy's testimony, the jury could find defendant guilty of murder beyond a reasonable doubt.

On the following Monday, July 17, 2017, just prior to defendant's testimony, the defense moved to dismiss the indictment for willful violation of the continuing obligation to provide discovery, or in the alternative, to again exclude Murphy's testimony.  Defense counsel represented that she had just learned over the weekend that during the service of a subpoena on Carlin on July 3, 2017, Carlin denied having shown Murphy a picture of defendant in the break room during the summer of 2014.  Counsel argued that the evidence was exculpatory because it contradicted both Murphy's version of how she discovered that defendant killed his wife and that Carlin had never had a conversation about defendant with her.

The prosecutor responded that detectives had served a subpoena on Carlin on July 3, 2017, as a rebuttal witness because he could not call Carlin as a witness to bolster Murphy's testimony during the State's case-in-chief. During service of the subpoena, the detectives had a "generic conversation"

with Carlin, which they did not document.  On July 15 or 16, 2017, Ruga interviewed Carlin and that information was provided to the defense in discovery.  The prosecutor represented that Carlin said he did not recall having a specific conversation with Murphy, but that it could have happened.

The trial judge denied the motions, finding that it did not rise to the level of a violation under Brady v. Maryland, 373 U.S. 83 (1963), because Carlin's statement was not "clearly exculpatory," and to the extent it contradicted Murphy's testimony, the defense can call him to testify.

Carlin subsequently testified for the defense that he first spoke to investigators from the Prosecutor's Office on July 3, 2017 and discussed his knowledge of the case with them.  Thereafter, on July 4 or 5, 2017, he spoke to Murphy and told her that "a couple [of] guys from the [P]rosecutor's [O]ffice came over [to his] house," and he asked her "what's going on."  Murphy asked him whether he remembered talking about defendant in the break room and showing her a picture of defendant on his phone.  Carlin replied, "I may have been in the break room, I might have heard people talking, but I've never ever brought his picture up on the phone."  He also denied having heard Murphy state that defendant told her he was going to kill his wife but admitted that he had heard people talking about the incident at the casino.

In denying defendant's motion for a new trial, the court found the State

had complied with its discovery obligations and had not committed a <u>Brady</u>

violation.  In a supplemental written decision, the court stated:

> Much of the defense argument went to the testimony of Elaine Murphy . . . .  She testified that on April 26, 2014 the [d]efendant told her he was going to kill his wife because she was lazy.  The name of the witness and her statement was provided to the [d]efense well before trial.  However, the exact date was not supplied until the witness testified.
>
> Defendant argued that Murphy's testimony was the only evidence of murder.  Defendant further argued that the failure to supply the date was so prejudicial as to require striking the witness's testimony or granting a new trial.  The State countered that the witness disclosed in her initial statement that the date might be identified if she were shown the casino records . . . .  The State further argued that a time frame was supplied in the initial statement (2-4 months prior to her learning of the murder) which was roughly consistent with the date supplied during her testimony.
>
> It bears repeating that given the nature of the act, and the [d]efendant's asserted defense, it could be that the jury simply did not believe [d]efendant.  Accordingly, [d]efendant's assertion that Ms. Murphy's testimony is the only evidence of murder is mistaken.
>
> Also, the State supplied the name and statement of the witness along with an approximate time frame when she heard [d]efendant make the comment.  Her statement included the suggestion that she might be able to pinpoint the date if shown the casino records.

For all of those reasons I determined that there was no <u>Brady</u> or discovery violation. There was certainly no prejudice or surprise which would have required the barring or striking of the witness's testimony or rising to the level under <u>Rule</u> 3:20-1 to require a new trial.

Regarding the timeliness of the State's disclosure of the Carlin interview, the judge found:

> Defendant was supplied with the particulars of the Carlin interview. Additionally, his testimony was not of such moment that such a failure would require a new trial. Carlin simply testified that he was a coworker of Murphy's and he did not hear her recount [defendant's] comment on the date and time she testified she told her coworkers. He did indicate that she may have said it on another occasion. Accordingly, I found no violation of the State's discovery obligation and no reason to order a new trial.

We are guided by well-established precedent. "<u>Rule</u> 3:13-3 entitles defendants to broad discovery and imposes an affirmative duty on the State to make timely disclosure of relevant information." <u>State v. Smith</u>, 224 N.J. 36, 48 (2016). "The metes and bounds of the State's discovery obligation to the defense is found in <u>Rule</u> 3:13-3(b), which states that '[d]iscovery shall include exculpatory information or material' and 'relevant material,' including all items set forth in ten separate categories." <u>State v. Hernandez</u>, 225 N.J. 451, 462

(2016) (alteration in original). "Late discovery can cause unfair surprise and raise due process concerns." Smith, 224 N.J. at 48.

The parties are under "a continuing duty to provide discovery" on the parties. R. 3:13-3(f). When a party fails to comply with its discovery obligations, the court "may order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate." Ibid. "An adjournment or continuance is a preferred remedy where circumstances permit." State v. Washington, 453 N.J. Super. 164, 190 (App. Div. 2018) (quoting State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002)). "A court's failure to take appropriate action to remedy a discovery violation can implicate the defendant's right to a fair trial." Smith, 224 N.J. at 48.

Trial courts have "broad discretion to determine the appropriate sanctions to be imposed for discovery-rule violations." State v. Marshall, 123 N.J. 1, 130 (1991). Reviewing courts afford "substantial deference to a trial court's issuance of a discovery order and will not interfere with such an order absent an abuse of discretion." Hernandez, 225 N.J. at 461.

Relevant here, Rule 3:13-3(b)(1)(G), provides that discovery shall include statements, whether "signed or unsigned, by such persons or by co-

defendants which are within the possession, custody or control of the prosecutor." Although the documents have not been provided on appeal, it is undisputed that in compliance with this rule, the prosecutor provided the defense with a copy of the transcript of Murphy's March 2015 statement and Ruga's report documenting that statement. The Prosecutor's Office did not document Murphy's subsequent oral statements.

"Our criminal discovery rules do not currently require the recordation of all statements of witnesses obtained by law enforcement officers." State v. W.B., 205 N.J. 588, 608 (2011). "[A] prosecutor is not obligated to create tangible items of evidence; he is only required to turn over items 'within the possession, custody or control of the prosecuting attorney.'" State v. Gordon, 261 N.J. Super. 462, 465 (App. Div. 1993) (quoting R. 3:13-3(a)(4), (6) and (8)). Rule 3:13-3(b)(1)(G) does not on its face include unrecorded oral statements by witnesses. Law enforcement officers are, however, required to retain their contemporaneous notes of witness interviews, and those notes are discoverable. W.B., 205 N.J. at 608. Notably, Ruga was not asked at trial whether he took notes during trial preparation with Murphy. In any event, the State does not dispute that this evidence was discoverable, contending instead that the prosecutor abided by our discovery rules and the Brady requirements in providing discovery to defendant.

The State's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. A court must consider three essential elements when determining "whether a Brady violation has occurred: (1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case." State v. Brown, 236 N.J. 497, 518 (2019). The presence "of those three elements evidences the deprivation of a defendant's constitutional right to a fair trial . . . ." Ibid. (citing Brady, 373 U.S. at 87).

"Determining whether the first two Brady elements have been satisfied is a straightforward analysis." Ibid. However, as in this case, where the suppressed evidence was discovered during the trial, "determining the third element -- whether the suppressed evidence is material -- is far more arduous." Ibid. In deciding materiality, courts "'examine the circumstances under which the nondisclosure arose' and '[t]he significance of a nondisclosure in the context of the entire record.'" Ibid. (alteration in original) (quoting Marshall, 123 N.J. at 199-200). "In determining the effect of the withheld evidence 'in the context of the entire record,'" courts "consider the strength of the State's

case, the timing of disclosure of the withheld evidence, the relevance of the suppressed evidence, and the withheld evidence's admissibility." Id. at 519 (quoting Marshall, 123 N.J. at 200). "[E]vidence is material if there is a 'reasonable probability' that timely production of the withheld evidence would have led to a different result at trial." Id. at 520 (citing United States v. Bagley, 473 U.S. 667, 682 (1985)).

Addressing each piece of evidence in turn, Murphy's statement that she recalled, after viewing the Borgata records, that defendant made the statement on April 26, 2014, did not establish the first Brady element because it was not favorable to defendant, either as exculpatory or impeachment evidence. The second Brady element was not satisfied because defendant was provided with the Borgata records and knew that Murphy could pinpoint the date by reviewing those records. By reviewing those records the defense would have learned that defendant only played "2-5 No Limit poker" on April 26, 2014, a date consistent with Murphy's statement that defendant spoke to her approximately two-to-four months before she learned of the shooting.

The third Brady element was also not satisfied. There was no reasonable probability that timely production of the exact date of defendant's comment to Murphy would have led to a different result at trial. Defendant has not demonstrated how this evidence would have affected the jury verdict, or that

he would have changed his trial strategy if provided with this information before trial. The fact that Murphy determined the exact date by checking the records, as she had originally proposed, served to bolster her credibility, and was entirely consistent with her initial statement. Moreover, the defense used Ruga's failure to document the statement in an attempt to impeach both his and Murphy's credibility, asking him whether he thought this information was important.

Next, Murphy's statement that defendant said his wife was lazy and liked to spent money, did not establish the first Brady element because it was clearly not favorable to defendant, either as exculpatory or impeachment evidence. There is no indication that the prosecutor had a record of the statement that was taken just two weeks before trial. Nor was there was a reasonable probability that the timely production of the statement would have led to a different result at trial. Defense counsel thoroughly cross-examined Murphy on this statement, which she admitted she was only seventy-five percent sure of as to the exact wording. The defense also knew, based on defendant's own statement, that Lynn liked to spend money, and based on statements by Christopher and Gloria, that the State intended to show defendant's motive for killing Lynn was to gain access to her money.

Carlin's statement that he had not shown a photo of defendant to Murphy, and that Murphy had not mentioned defendant's statement about wanting to kill his wife to him, was favorable to the defense as impeachment evidence. Nonetheless, the second <u>Brady</u> element was not established because the State did not suppress this evidence. The State provided Carlin's name to the defense in discovery. The Prosecutor's Office did not actually interview him until after the trial had started, and promptly submitted his recorded statement.

Defendant argues the failure to timely disclose this evidence prevented him from conducting an effective cross examination of Murphy, who he contends was the "pivotal" witness in this case. We disagree. Although Carlin's statement was produced after Murphy testified, the defense called Carlin as a witness and used his testimony to its advantage to impeach both Murphy's and Ruga's credibility.

Additionally, defendant has not demonstrated that there is a reasonable probability that earlier production of the allegedly withheld evidence would have led to a different result at trial. Carlin's statement was not an important piece of evidence because Murphy's testimony was not the only, or even the primary evidence, that defendant murdered his wife. The State presented evidence that defendant would have been able to immediately distinguish the

difference between the 12-gauge buckshot shell used to kill Lynn, and the snap cap he said he thought he had loaded into the gun. The State also presented evidence that cast doubt on defendant's version of the events, in that cleaning a shotgun was messy and usually causes an area to get dirty, yet the light-colored carpet in the area where defendant purportedly cleaned the gun was "very clean." Further, defendant's actions after Lynn's death, and his comments in his statement about Lynn's expensive tastes and relationship with Karrer, who he called "a f***king redneck, scum," supported the theory that defendant murdered his wife because he was jealous and did not want her to find out that he had taken the cash out of the safety deposit box. Christopher's testimony regarding defendant's actions after his mother's death bolstered this theory of the case.

This case is readily distinguishable from <u>Brown</u>, on which defendant relies, where the prosecution failed to produce, until one week into defendants' murder trial, nineteen discovery items, including eighteen reports and an affidavit, which had been in their possession. 236 N.J. at 502. The <u>Brown</u> Court found that all three <u>Brady</u> elements had been established. <u>Id.</u> at 503.

We find that no abuse of discretion in denying defendant's request for sanctions under <u>Rule</u> 3:13-3(f). Although courts have the inherent power to dismiss an indictment when the State fails to comply with discovery rules

under Rule 3:13-3(f), State v. Abbati, 99 N.J. 418, 429 (1985), "[b]efore dismissal of an indictment is warranted" based on a discovery violation "there must be a finding of intention inconsistent with fair play and therefore inconsistent with due process, or an egregious carelessness or prosecutorial excess tantamount to suppression," State v. Laganella, 144 N.J. Super. 268, 282 (App. Div. 1976). "In the absence of these conditions, the right of the public to its day in court in the prosecution of properly found indictments should be forfeited only if otherwise there would be manifest and harmful prejudice to defendant." Id. at 282-83.

Here, defendant failed to establish that the State violated the discovery rules or infringed upon his due process rights by violating the commands of Brady. We conclude the trial judge did not err in denying defendant's motions to strike Murphy's testimony or to dismiss the indictment, or by otherwise denying his request for sanctions under Rule 3:13-3(f).

## III.

Prior to trial, defendant moved to suppress his statement to the police on the basis that it was not voluntary, and because he did not "have the appropriate mental state to make a knowing, voluntary, and intelligent waiver" of his Miranda rights. He argues in Point II that the court erred in failing to rule on the voluntariness of his statement to the police, and in Point IV that the

court erred in denying his motion to suppress the statement because as a result of his "distraught mental condition" he "did not have the capacity to either understand the ramifications of a waiver of his rights, or to knowingly or voluntarily waive them." We are unpersuaded.

During the two-day N.J.R.E. 104(c) hearing on the suppression motion, the judge, who had had access to the entire video-recorded interview, watched several portions of the interview, including the sections where defendant was read and waived his <u>Miranda</u> rights, where he described the shooting, and where the detective told him that his wife was dead. The judge also heard testimony from three witnesses: Jamerson; Detective William Hanton, Jr., of the Prosecutor's Office; and defendant.

Jamerson testified at the hearing, consistent with his testimony at trial, that upon arrival on the day of the incident he heard defendant "yelling and screaming" that "I shot my wife," and that "[i]t was supposed to be a dummy round." He said defendant was crying and seemed "visibly upset." He recalled that Spencer asked defendant to sit on the ground because defendant did not seem mentally stable due to the circumstances. Jamerson wrote in his report that "[d]ue to [defendant's] altered mental status and continuous verbal outbursts, he was detained using handcuffs and secured in the rear" of the patrol car during transport to the Prosecutor's Office. Jamerson did not

respond when defendant asked if they were taking him to the hospital to see his wife.

Hanton, who did not testify at trial, testified at the hearing that upon arrival at the Prosecutor's Office, defendant was handcuffed and was wearing boxer shorts, a tee shirt, and had a blanket. Hanton removed defendant's handcuffs and read him his Miranda rights. Defendant then signed the waiver form. During the interview, which began at 11:37 p.m., the officers allowed defendant to keep the blanket for his comfort, gave him a water bottle, and allowed him to use the bathroom.

Hanton testified that defendant was upset and "went back and forth between being distraught and being able to speak rationally and calmly." He said that defendant was able to give a statement and "very clear in the things he told me in his statement, what happened that night and how she died." Although defendant asked several times how his wife was, Hanton did not respond at first because his job was to take a statement and he did not want "to make [defendant] more upset." Hanton also "felt [that defendant] knew that his wife had passed away" because defendant had touched her body after he shot her and "had blood on his hands."

Defendant testified at the hearing that he believed the officers were transporting him to the hospital to see his wife after the incident. He claimed

he did not remember having been read his <u>Miranda</u> rights, or signing the waiver form, and that the only thing on his mind was that he wanted to see his wife. He also claimed he did not recall his statements to the officers or that the officers told him that his wife had died, stating that his "mind is lost" and that he had "never acted like that in [his] whole life." He admitted that the officers "were nice people," and that he felt "very, very secure" when he got to the Prosecutor's Office, and "very comfortable" speaking to the officers. He also acknowledged that he was not threatened or intimidated by the officers and was happy to tell them the truth about what happened that night so that he could see his wife.

The motion judge denied the motion to suppress finding that defendant had "made a knowing, intelligent, and voluntary waiver" of his <u>Miranda</u> rights. The judge found that it "was very clear" from reviewing the video that "although [defendant] had alternating states of mind throughout the proceeding," he was at times "very calm and collected," and appeared to understand his rights and "entered into a knowing and voluntary waiver of those rights prior to be questioned."

The judge further concluded there was no evidence that defendant's statement was coerced by the officers' conduct. He noted defendant's testimony that "everyone that questioned him [and] that he came into contact

with was very kind to him. It was very cordial." Defendant "felt safe and secure around law enforcement since his son is a state trooper, and he was very proud of his son's career choice." The judge determined this was not a setting where defendant "was uncomfortable or . . . felt that any of the law enforcement officers were mistreating him or trying to manipulate him in any fashion."

Moreover, in assessing the circumstances surrounding the interview, the judge found the officers removed defendant's handcuffs prior to questioning him, the officers gave him a blanket to preserve his dignity and to keep him warm, the interview was relatively short, and the officers gave defendant an opportunity "to cut off the questioning" every time they came back in the room. The judge determined defendant "was a willing participant here. He wanted to tell his story."

The judge also concluded that the police had no obligation under Miranda to inform defendant early on during the interview that his wife had died. On the contrary, the judge found that defendant's argument that he had not voluntarily waived his rights as a result of his mental state may have been stronger if the interviewers had told defendant his wife had died at the outset of the interview. The judge theorized that if defendant had been told early on that his wife had died, his reaction may have been even more extreme than

"what we saw in the video" and "he wouldn't have been able to go further in the questioning." Instead, the officers waited well into the questioning, and then they informed defendant about his wife and "as suspected, he was very, very emotional."

The judge held that defendant's statement was admissible. At that point, defense counsel clarified that the motion was two-fold, first whether there was a knowing, intelligent, and voluntary waiver, which the judge found, and second whether the statement itself was knowing, intelligent and voluntary. As to the second issue, the prosecutor responded it was a jury issue. The judge agreed with the State, noting the jury will watch the statement and "test" defendant's state of mind. The judge reiterated his finding that defendant "made a knowing, voluntary, intelligent waiver of his Miranda rights" and "was given sufficient opportunity to cut off questioning, sufficient opportunity to request an attorney."

Although he initially stated he was not going to make a finding as to the voluntariness of the statement, the judge then said that he would "go even further," and made findings as to the voluntariness of the statement by distinguishing this case from State v. Pickles, 46 N.J. 542 (1966), a case cited by defense counsel. The judge noted the defendant in Pickles was taking

medication which affected her ability to provide a knowing, willing, voluntary, and intelligent statement. "We don't have those circumstances here."

"Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review." State v. Tillery, 238 N.J. 293, 314 (2019).

A.  Voluntariness of Defendant's Statement

On appeal, defendant argues the motion judge erred in refusing to rule on the voluntariness of his statement, thereby mandating that his statement should be suppressed and excluded from evidence. We disagree because we find the judge both explicitly and implicitly made findings on the voluntariness of the statement in addressing the Miranda waiver issue.

"[T]he Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, guarantees the right against

self-incrimination[.]" W.B., 205 N.J. at 604-05 (footnote and citations omitted). "Inherent in every Fifth Amendment analysis is the question of whether the statement was voluntary, and, independently, whether the law enforcement officers taking it complied with Miranda." Id. at 605.

The State has the affirmative duty to prove beyond a reasonable doubt, "both that the defendant's statement was voluntary and, if custodial, that the defendant was advised of his rights and knowingly, voluntarily and intelligently waived them." Id. at 602 n.3.

A reviewing court "should engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. L.H., 239 N.J. 22, 47 (2019) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)). "Subject to that caveat," reviewing courts "generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record." Ibid.

Although it is not entirely clear, the motion judge's comments seemingly referred to the jury's role in determining the credibility and reliability of the statement and the evidential weight it should be given. See W.B., 205 N.J. at 605 n.7 (defendant produced witnesses to testify that he was tired and intoxicated before being taken to headquarters, but that evidence was relevant only to the jury's evaluation of the credibility and "reliability" of the statement

under N.J.R.E. 104(c)); State v. Rosales, 202 N.J. 549, 566-67 (2010) (recognizing that expert psychiatric testimony regarding the validity of a defendant's confession may be permitted in some cases); State v. King, 387 N.J. Super. 522, 550 (App. Div. 2006) (permitting psychiatric testimony about the defendant's personality disorder as relevant to defendant's false confession claim). See also Crane v. Kentucky, 476 U.S. 683, 689 (1986) (confessions, even if found to be voluntary, are not conclusive of guilt and may be shown to be "unworthy of belief").

Nonetheless, the judge briefly, but explicitly, addressed defendant's argument that he did not have the mental state to make a voluntary statement by distinguishing Pickles. In that case, the police interrogated the defendant about her infant son's death immediately after the child's funeral. 46 N.J. at 572. During the interrogation the defendant was sobbing, shaking, trembling, distraught, and so "emotionally upset" that the police asked a matron to come into the room, who placed an ammoniated capsule under the defendant's nose and gave her a "drink of spirits of ammonia." Ibid.

The Pickles Court found that the defendant's condition rendered her "easy prey to interrogative pressure. The need for the medication administered to her by the court matron, to which the detectives seemed to close their eyes, plainly revealed her physical and mental weakness, and should have been

sufficient warning to stay their hand." Id. at 577. Thus, the circumstances attending the taking of the incriminating statement satisfied the Court that "they were so oppressively coercive and fundamentally unfair in their totality as to require the conclusion that the statement was not voluntary in the constitutional sense." Id. at 578. Here, the motion judge found the facts were "very, very distinct" from Pickles for "all of the reasons argued by the State," including that the officers in Pickles had to arrange to administer medication to the defendant to calm her down sufficiently to be able to give a statement.

Moreover, as the State contends, viewed in their entirety, the motion judge's findings implicitly support a conclusion that the statement was voluntary. The judge, in addressing the Miranda waiver issue, considered the totality of the circumstances as portrayed in the video-recording and by the testimony, and considered the nature of the interrogation, the conduct of the interviewers, defendant's responses to the questions, and his mental state during the examination—factors that are also directly relevant and significant in determining the voluntariness of his statement.

"Due process also requires that the State 'prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne.'" L.H., 239 N.J. at 42 (quoting State v. Knight, 183 N.J. 449, 462 (2005)). "The due process test takes into

consideration 'the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'" Ibid. (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973))). "The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against his power to resist confessing." Id. at 43.

"[T]he factors relevant to the voluntariness analysis include 'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved,' as well as previous encounters with law enforcement." L.H., 239 N.J. at 43 (quoting Hreha, 217 N.J. at 383). "The real issue is whether the person's decision to confess results from a change of mind rather than from an overbearing of the suspect's will." State v. Galloway, 133 N.J. 631, 655 (1993).

The trial judge considered these factors, which are relevant in determining whether a statement was voluntary, in addressing the Miranda waiver issue. For example, the judge found that defendant was read his Miranda rights and voluntarily waived them, he was detained for only three hours during which he was given a blanket to keep him warm, he admitted that

he felt "very comfortable and secure," and every time the investigators left the room they gave defendant an opportunity to cut off the questioning. The judge also found the police did not engage in overreaching or overbearing conduct during the interrogation as evidenced by defendant's comfort level in dealing with them. The judge further found that the officers were not obligated to tell defendant that his wife had died at the beginning of the interrogation, nor did they misrepresent that fact during the interrogation. Cf. State v. Patton, 362 N.J. Super. 16, 46 (App. Div. 2003) (fabrication of evidence by police to elicit a confession violates due process, and any resulting confession is per se inadmissible).

Although there is evidence defendant was very emotional at times during the interrogation, he also acted calm and collected at times, and he recounted in detail the events leading up to Lynn's death. As the judge found, the record clearly demonstrates that despite defendant's emotional state, he had the ability to understand and voluntarily and knowingly waive his Miranda rights. See State v. Smith, 307 N.J. Super. 1, 10 (App. Div. 1997) (the fact that the defendant was suffering from a mental illness at the time of the questioning did not render his waiver or his statement involuntary); State v. Glover, 230 N.J. Super. 333, 342 (App. Div. 1988) (the court found that the record clearly demonstrated that the defendant's ability to make free and rational choices

when interrogated by the police was not "overborne by defendant's severe mental illness").

Moreover, as we have noted, defendant stated that the officers "were nice people," and that he felt "very, very secure" when he got to the Prosecutor's Office, and "very comfortable" speaking to the officers. He also acknowledged that he was not threatened or intimidated by the officers and was happy to tell them the truth about what happened that night so that he could see his wife. This description significantly undermines any claim that his will was overborne.

Significantly, although defendant was clearly emotional during segments of his statement, he never wavered from his claim that Lynn's death was an accident and that he thought he had loaded the gun with a snap cap. His statement to the police was also consistent with his statements during his 9-1-1 call, and to Schnitzel and Spencer, and substantially in accord with his testimony at trial. Despite his emotional state, defendant was strong enough to resist confessing to intentionally shooting his wife even when the officers asked him if he had pointed the gun at Lynn on purpose and why he shot her. Thus, as in <u>Glover</u>, defendant's will was not overborne by his emotional state. Further, any inconsistencies in his trial testimony, including whether he knew the buckshot shells were in the bag on the day of the shooting, whether he

learned that Karrer had given Lynn the buckshot shells at trial, and whether they routinely cleaned the guns after they went shooting on Sundays, could be considered by the jury in assessing the reliability of his statement.

Notably, defendant did not introduce any expert testimony or other competent psychological or psychiatric evidence at the suppression motion hearing that he was suffering from a mental illness that vitiated his ability to voluntarily give a statement to the police. At most, defendant testified at the hearing that he was hospitalized for seven to ten days because the psychiatrists mistakenly interpreted his statement that he wanted to be with his wife as meaning he wanted to be dead. No evidence of any diagnosis was introduced. Defendant stated that the psychiatrist told him "you're grieving."

We conclude that the totality of all the circumstances, including both the characteristics of the accused and the details of the interrogation, supports a determination that defendant's will was not overborne, and his statement was voluntary. While the motion judge could have made more specific findings, we discern no error.

B. Waiver of Defendant's Miranda Rights

Defendant also argues that State did not prove beyond a reasonable doubt that the waiver of his Miranda rights was made knowingly, intelligently, and voluntarily. He argues that based on his mental state, he did not possess

the mental faculties to listen to, understand, and make a knowing, intelligent, and voluntary waiver of his rights. We disagree.

The motion judge's finding that defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights is supported by the substantial credible evidence in the testimonial and videotaped record. The officers read defendant his <u>Miranda</u> rights. Defendant said he understood them and signed a waiver form. As the judge found, during the video-recorded interrogation, defendant calmly said he understood his rights and agreed to waive them prior to being questioned. Defendant testified that he felt very secure and comfortable when talking to the officers. Defendant never asked to stop the questioning and did not indicate he wanted to speak to an attorney.

The record amply supports the judge's finding that although defendant was emotional, he was "a willing participant" and "wanted to tell his story." Noticeably absent is any evidence that defendant was beset by a thought disorder or otherwise unable to understand his rights and intelligently and voluntarily waive them. Defendant's argument lacks sufficient merit to warrant further discussion in this opinion. <u>R.</u> 2:11-3(e)(2).

IV.

A-1350-17T1

We next address defendant's argument that the prosecutor's comments on facts not in evidence during summation deprived him of a fair trial. We are unpersuaded.

The prosecutor began his summation by stating that he wanted to recount "a story of murder and it's a story of the two oldest motives for murder human history has ever come up with, it's a story of money and jealous[]y, and the best part about this story is that it's a true story, true story." Defendant argues the prosecutor made many misstatements of fact and stated facts not in evidence, including that: (1) defendant gambled "four, five, six nights a week and, look, gambling is an overnight business, so he's not home four, five, six nights a week;" (2) if Lynn left him, he would get nothing because everything was in her name; (3) defendant deliberately shot Lynn with a shotgun shell she got from Karrer; (4) defendant staged the shooting when his wife was asleep; and (5) defendant killed his wife to prevent her from leaving him with nothing. The prosecutor also stated defendant said it was an accident, and "yet the police don't believe him and his son doesn't believe him, and now his son has the audacity to sue him to keep him from inheriting his mother's money."

At the beginning of the trial, the judge instructed the jury that they were "the sole judges of the facts," and that comments by the attorneys were not evidence. Immediately after the prosecutor's summation, the final charge

included an instruction that they were "the sole and exclusive judges of the evidence," and that "[a]rguments, statements, remarks, openings, closings of counsel are not evidence and must not be treated as evidence."

While the jury was deliberating, the defense objected to certain factual representations by the prosecutor in his summation. Counsel argued there was no evidence defendant had spent four, five, or six nights sleeping over at the Borgata, or that Lynn was planning on filing for divorce and if she did defendant would get nothing, and that she had been unfaithful. The defense requested a curative instruction that nothing counsel says in closing arguments is evidence. The prosecutor countered that everything he said was well within fair comment based on the evidence presented at trial, and that the jury had been instructed that arguments by counsel were not evidence.

The judge declined to issue a curative instruction, noting that the jury had been instructed both in the initial and the final charge that they, not the lawyers, were the judges of the facts.

In denying defendant's motion for a new trial, the judge found that there was nothing in this record "to suggest that the State's argument in summation, although forceful, somehow crossed the line and tainted the jury verdict." "With regard to the motive and murder scene, [the judge] found the Prosecutor drew from specific testimony and evidence in the record." As to arguments

pertaining to defendant's credibility, the judge stated, "the record shows that the Prosecutor simply made reference to discrepancies between the Defendant's testimony and other parts of the record."

"'[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are therefore 'afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented.'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "[A]t the same time [prosecutors must] help assure that the accused is treated fairly and that justice is done.'" Id. at 274 (quoting State v. Mahoney, 188 N.J. 359, 376 (2006)).

"Consistent with their obligation to seek justice, prosecutors may not advance improper arguments." State v. Lazo, 209 N.J. 9, 29 (2012). To that end, prosecutors may not "make inaccurate legal or factual assertions" and must "confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001). A legitimate inference can be "based on sharply disputed facts in the record." McNeil-Thomas, 238 N.J. at 280 (quoting Lazo, 209 N.J. at 29). "Ultimately it [is] for the jury to decide whether to draw the inferences the prosecutor urged." State v. Carter, 91 N.J. 86, 125 (1982).

"Furthermore, even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." McNeil-Thomas, 238 N.J. at 275. "[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." State v. Timmendequas, 161 N.J. 515, 575 (1999).

"Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" State v. Jackson, 211 N.J. 394, 409 (2012) (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)). "[T]he prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Wakefield, 190 N.J. at 438 (quoting State v. Papasavvas (I), 163 N.J. 565, 625 (2000)).

Addressing each argument in turn, the prosecutor's comments that this was a story of money and jealousy was reasonably related to the scope of the evidence presented. Christopher and Gloria testified that defendant and Lynn frequently argued about money, defendant knew about Lynn's life insurance policy, defendant engaged in a lengthy legal battle over Lynn's estate, and defendant had removed money from Lynn's safety deposit box prior to her

death. There was also evidence that Karrer had introduced Lynn to target shooting, Karrer often texted and called Lynn, defendant asked Christopher and Gloria to tell Lynn to stop talking to Karrer, and Karrer had given Lynn the buckshot as a gift. Notably, defendant called Karrer a "f***ing redneck, scum," further supporting a legitimate inference that defendant was displeased with his wife's contact with Karrer.

Next, the prosecutor's comment that defendant gambled "four, five, six nights a week" and was not home on those nights, was supported by the evidence. Defendant admitted that he gambled at the Borgata "approximately four times a week," and his brother testified that defendant would gamble four or five times a week. Defendant described himself as a professional poker player, who had intended to "stay at the Borgata" on the night of Lynn's death "and play overnight."

It was also a reasonable inference based on the evidence that if Lynn left defendant, he would get nothing because everything was in her name, and that he killed her to prevent her from doing that. Defendant stated that all their assets had been placed in Lynn's name to protect their assets from creditors of the restaurant, and that she "control[led]" their money, and "handled all the finances." Defendant's only income was his disability check and any gambling winnings. He did not have access to their checking account. Christopher

testified that all his parents' assets were in his mother's name because his mother did not trust defendant "with finances." Further, according to Christopher, defendant removed approximately $80,000 from Lynn's safety deposit box sometime prior to her death, without her knowledge or consent. The evidence permitted an inference that defendant believed his wife would not allow him to have access to the money and that his motive in murdering her was money.

Defendant argues for the first time on appeal that the prosecutor's comment that defendant deliberately shot Lynn with the shotgun shell she received from Karrer was not supported by the evidence. There was, however, evidence that Karrer had given Lynn the buckshot shell that killed her, and that defendant was unhappy with the amount of contact that his wife had with Karrer. Moreover, the failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made and deprived the court of the opportunity to take curative action. Timmendequas, 161 N.J. at 576.

Defendant also argues for the first time on appeal that the prosecutor's comment that defendant waited until Lynn was sleeping before he staged the shooting was not supported by the evidence. He considers this the "most egregious" of the prosecutor's statements. There was evidence that Lynn was

asleep when she was shot. The shooting occurred at approximately 9:30 p.m., the only light was from the television and a candle, Lynn was lying on the couch under a blanket, she was wearing pajamas, and the medical examiner concluded that her eyes were closed when she was shot.

Lastly, defendant argues the prosecutor committed misconduct in stating that "the police don't believe him and his son doesn't believe him, and now his son has the audacity to sue him to keep him from inheriting his mother's money." As the trial judge found, the prosecutor did not express his personal opinion as to defendant's credibility. See State v. Jenkins, 299 N.J. Super. 61, 70 (App. Div. 1997) (a prosecutor has the right to call to the jury's attention discrepancies in a defendant's testimony and then argue that the defendant was not truthful, but cannot express a personal opinion regarding the credibility of a defendant's testimony). Nor did the prosecutor express a personal opinion about the officers' and Christopher's credibility, and instead based the comments on evidence presented at trial.

The trial judge properly found the prosecutor did not engage in misconduct during summation. The prosecutor's comments were confined to the evidence and reasonable inferences to be drawn from that evidence. Nor were the prosecutor's comments "so egregious as to deprive defendant of a fair trial." Timmendequas, 161 N.J. at 575. We discern no error.

V.

Defendant moved for a new trial pursuant to Rule 3:20-1 based on the alleged willful discovery violations by the State, prosecutorial misconduct during summation, and the insufficiency of the credible evidence to prove knowing and purposeful murder beyond a reasonable doubt.[2]  The trial judge denied the motion, finding the verdict was not against the weight of the evidence.

A jury verdict shall not be set aside "as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law."  R. 3:20-1.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown."  State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).  "There is no 'miscarriage of justice' when 'any trier of fact could rationally have found beyond a reasonable doubt

_____

[2]  As we have already rejected defendant's arguments that the prosecutor committed willful discovery violations and engaged in misconduct during summation, we will not readdress those issues here.

that the essential elements of the crime were present.'" Jackson, 211 N.J. at 413-14 (quoting State v. Afanador, 134 N.J. 162, 178 (1993)). We "must weigh heavily the trial court's 'views of credibility of witnesses, their demeanor, and [its] general feel of the case.'" Carter, 91 N.J. at 96 (alteration in original) (quoting State v. Sims, 65 N.J. 359, 373 (1974)).

Applying those principles, we concur with the trial judge that the verdict was not against the weight of the evidence. The jury could rationally have found beyond a reasonable doubt that the elements of purposeful and knowing murder were present. To that end, a reasonable jury could find defendant intentionally shot his wife based upon the evidence that she sustained a gunshot wound to the head, was shot at close range, her eyes were closed, it should have been immediately apparent to defendant that he was loading a live shell into the shotgun, and defendant acted out of jealousy and had a financial motive to kill her.

## VI.

Finally, defendant argues that the cumulative effect of the trial court's errors deprived him of a fair trial. We find no merit to this argument.

Our Supreme Court has "recognized . . . that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to

require reversal." <u>State v. Jenewicz</u>, 193 N.J. 440, 473 (2008). "Where the aggregation of legal errors renders a trial unfair, a new trial is required." <u>State v. T.J.M.</u>, 220 N.J. 220, 238 (2015). However, the principle of cumulative error does not apply "where no error was prejudicial and the trial was fair." <u>Ibid.</u> (quoting <u>State v. Weaver</u>, 219 N.J. 131, 155 (2014)).

Defendant has not demonstrated any prejudicial error occurred. Accordingly, the principle of cumulative error has no application.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

Affirmed.